IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
NORFOLK DIVISION

| | |
|---|---|
| HILL-ROM COMPANY, INC., HILL-ROM MANUFACTURING, INC., and HILL-ROM SERVICES, INC.<br><br>Plaintiffs,<br><br>v.<br><br>GENERAL ELECTRIC COMPANY,<br><br>Defendant. | Case No. 2:14-cv-187-RGD-LRL |

# DECLARATION OF JAMES E. MALACKOWSKI IN SUPPORT OF GENERAL ELECTRIC COMPANY'S OPPOSITION TO HILL-ROM'S MOTION FOR PRELIMINARY INJUNCTION

I, James E. Malackowski, declare that:

## I. SUMMARY OF OPINIONS

1. Based on my work in this matter, it is my opinion that:

- General Electric Company's ("GE") continued sale of AgileTrac™ Hand Hygiene monitoring system ("the Accused System") during the pendency of this litigation would have little impact, if any, on the Plaintiffs'[1] current or future business. Dr. Reiff's *"two-supplier market"* assumption is invalid, as a number of competitors offer alternative hand hygiene monitoring systems that compete with Hill-Rom's system and the Accused System. In addition, according to Hill-Rom, the U.S. market for real-time-locating-system[2]-hand-hygiene-compliance systems ("the Relevant Market") was a mere $5.0 million as of 2013.[3] Thus, assuming for the sake of argument, that Hill-Rom had market exclusivity, and that its Hand Hygiene Compliance Solution system represented 100% of the Relevant Market, revenue from sales of Hill-Rom's system would constitute only 0.3% of Hill-Rom's 2013 total revenue of $1.7 billion.[4]

- Contrary to Dr. Reiff's assertions, the Relevant Market is characterized by low growth rates, as hospitals have been slow to adopt RTLS hand hygiene technologies. According to Hill-Rom, it has only *"sold and installed <u>several</u> hand hygiene systems in the United States."*[5] Likewise, GE has sold and/or installed only five Accused Systems since 2009. And each of the five Accused Systems GE installed were in hospitals in which GE's non-accused AgileTrac™ software system had been previously installed. Thus, notwithstanding Dr. Reiff's claims, the Relevant Market is not growing at such a rate that would impede the quantification of the losses Hill-Rom may sustain, if any, as a result of GE's continued sale of the Accused System during the pendency of this litigation.

- Hill-Rom's claim that its Hand Hygiene Compliance Solution system drives sales of other Hill-Rom RTLS-based[6] and non-RTLS-based products[7] is unfounded

---

[1] Hill-Rom Company, Inc., Hill-Rom Services, Inc., and Hill-Rom Manufacturing, Inc.'s (collectively, "Hill-Rom").
[2] ("RTLS").
[3] McMullin Decl. ¶ 16.
[4] $5.0 million / $1.7 billion = 0.3%. Hill-Rom Holdings, Inc. 2013 Form 10-K, p. 20.
[5] Memorandum of Law in Support of Plaintiffs' Motion for Preliminary Injunction, p. 5 (emphasis added).
[6] Such as, for example, Hill-Rom Asset Tracking Solution systems and TeleTracking asset tracking software. (*See TeleTracking, Hill-Rom Sign RTLS Cross Selling Agreement,* March 20, 2014, TeleTracking; http://www.teletracking.com/news/index.cfm?mode=detail_news&news=96B06F3F-1372-5B6F-0BB4D87DF906CCAB.)

and invalid.[8] Hill-Rom introduced the Hand Hygiene Compliance Solution just last year,[9] as a RTLS application which *"can use the same hardware and devices as other Hill-Rom real-time locating solutions"*[10] such as, for example, its Hill-Rom Asset Tracking Solution. Likewise, GE markets and sells the Accused System as an extension to the non-accused AgileTrac™ software system that includes its resource tracking system.[11] In fact, each of the five hospitals in which the Accused System has been installed were previously equipped with GE's non-accused AgileTrac™ software system.[12] Thus, Hill-Rom's system and the Accused System are add-on modules that hospitals may acquire after adopting RTLS technology, and do not drive sales of other RTLS products.

- Hill-Rom's alleged "harm" to its goodwill and reputation is speculative and unsubstantiated. Hill-Rom is well known in the healthcare industry for other healthcare-related products such as, for example, Hill-Rom hospital beds and the NaviCare® Nurse Call system. Hill-Rom's reputation and customer relationships are not dependant upon Hill-Rom's sale of its Hand Hygiene Compliance Solution. In addition, there is no evidence that Hill-Rom has sustained a loss of goodwill or reputation since it introduced its Hand Hygiene Compliance Solution.

- Any loss Hill-Rom may sustain as a result of GE's continued sale of the Accused System during the anticipated 11.1 month pendency[13] of this litigation may be readily quantified to a reasonable degree of economic certainty and, therefore, Hill-Rom will be fully compensated through a legal remedy, if necessary.

2.  Accordingly, it is my opinion that the potential losses and speculative "harms" Hill-Rom alleges are not (and cannot be) "irreparable harm" as I understand the courts have defined that term.

---

[7] Such as, for example, hospital beds and NaviCare® Nurse Call system.
[8] Memorandum of Law in Support of Plaintiffs' Motion for Preliminary Injunction, p. 22.
[9] On June 11, 2013.
[10] "Hill-Rom Launches New Hospital Hand Hygiene Monitoring Solution", June 11, 2013, Hill-Rom.
[11] The AgileTrac™ suite of products include asset, staff, and patient tracking via RTLS technologies.
[12] Dirksmeier Decl. ¶ 25.
[13] This estimate of case duration is based median time from filing to trial of civil cases in the E.D. Va. for 2013.

3

## II. QUALIFICATIONS

3.  I am the Chairman and Chief Executive Officer of Ocean Tomo, LLC, an integrated Intellectual Capital Merchant Banc™ firm providing an industry leading array of financial products and services related to intangible assets. Ocean Tomo offerings include expert testimony, valuation, strategy, investments, innovation management and transactions. Ocean Tomo assists clients – corporations, law firms, governments and institutional investors – in realizing Intellectual Capital Equity® value broadly defined. Ocean Tomo is the founder of the Intellectual Property Exchange International, Inc. where I serve as Co-Chairman.

4.  I am a founding and continuous member of the IP Hall of Fame Academy. I have been recognized annually since 2007 by leading industry publications as one of the 'World's Leading IP Strategists.' Significantly, I was named as one of 50 individuals, companies and institutions that framed the first 50 issues of *IAM Magazine*; listed among "50 Under 45" by *IP Law & Business*™; and, named as one of "The Most Influential People in IP" by *Managing Intellectual Property*™. In 2011 I was selected by the World Economic Forum as one of less than twenty members of the Network of Global Agenda Councils to focus on questions of IP policy. In 2013 I was inducted into the Chicago Area Entrepreneurship Hall of Fame by the Institute for Entrepreneurial Studies at the University of Illinois at Chicago College of Business Administration.

5.  I have advised clients and counsel on business valuation issues as well as all phases of the technology transfer process. I have substantial experience as a Board Director for leading technology corporations and research organizations as well as companies with critical brand management issues. I am Past President of The Licensing Executives Society International, Inc. as well as its largest chapter, LES USA & Canada, Inc. Today, I focus my

non-for-profit efforts with organizations leveraging science and innovation for the benefit of children, including those located in lesser developed countries. I am a Director of the Stanley Manne Children's Research Institute and have served since 2002 as a Trustee or Director of Invent Now, Inc., an organization providing summer enrichment programs for more than 90,000 students annually. I am the Founder of the Chicago based Center for Applied Innovation (CAI), an Illinois non-for-profit corporation created to manage education, public policy outreach and related economic activity around applied technology and intellectual property rights.

6. I am a frequent speaker on emerging technology markets and related financial measures. I have addressed mass media audiences including Bloomberg Morning Call, Bloomberg Evening Market Pulse, Bloomberg Final Word, CNBC Closing Bell, CNBC On the Money, CNBC Street Signs, CBS News Radio and Fox Business National Television as well as other recognized news-based internet video channels

7. On more than forty occasions, I have served as an expert in U.S. Federal Court, U.S. Bankruptcy Court, State Court, the Ontario Superior Court of Justice or the International Trade Commission on questions relating to intellectual property economics, including the subject of business valuation, reasonable royalty, lost profits, price erosion, commercial success, corrective advertising, creditor allocations, Hatch Waxman Act market exclusivity, and/or the equities of a potential injunction. As an inventor, I have more than twenty issued U.S. patents. I am a frequent instructor for graduate studies on IP management and markets and a Summa Cum Laude graduate of the University of Notre Dame majoring in accountancy and philosophy. I am Certified in Financial Forensics, a Certified Licensing Professional and a Registered Certified Public Accountant in the State of Illinois. A listing of my prior testimony is provided in my curriculum vitae, attached as **Exhibit A**.

### III. ASSIGNMENT AND MATERIALS CONSIDERED

8. I have been asked by counsel for GE to analyze and evaluate the equities of a potential preliminary injunction, and submit this declaration in the above-captioned matter.

9. I have reviewed, analyzed and evaluated: (i) Hill-Rom's Motion for Preliminary Injunction; (ii) Memorandum of Law in Support of Plaintiffs' Motion for Preliminary Injunction; (iii) the Declaration of Bradley N. Reiff ("Dr. Reiff"); (iv) the Declaration of Adam McMullin; (v) the Declaration of Timothy Wildman ; (vi) the Declaration of Robin A. Felder, Ph.D; (vii) Hill-Rom SEC disclosures, (viii) discussion with Francis Dirksmeier ("Mr. Dirksmeier") and a review of his Declaration ("the Dirksmeier Declaration"), and (ix) other relevant documents in order to consider certain factors relating to the potential issuance of a preliminary injunction against GE's continued U.S. sales of the Accused System.

10. My opinions and the bases of my opinions are set forth below.

### IV. THE CONTINUED SALE OF THE ACCUSED SYSTEM WILL HAVE LITTLE IMPACT, IF ANY, ON HILL-ROM'S CURRENT AND FUTURE BUSINESS

11. For a number of reasons, the continued sale of the Accused System during the anticipated 11.1 month pendency of this litigation will have little impact, if any, on Hill-Rom's current and future business.

12. First, and contrary to Dr. Reiff's claims, the Relevant Market is not *"two-supplier."* The Relevant Market is comprised of at least 17 competitors. Companies that offer alternative hand hygiene monitoring solutions include, for example:

- Awarepoint – is a company located in San Diego, California. Awarepoint claims to be *"at the forefront of RTLS innovation with easy-to-use patented*

technology."[14] Awarepoint offers its Hand Hygiene product that *"uses location tracking devices to monitor staff compliance with soap-and-water or gel-based hand hygiene in relation to patient encounters and food handling."*[15]

- Centrak – is a corporation located in Newtown, Pennsylvania that claims to be "the leading provider of precise, versatile, and cost-effective location solution for healthcare." According to Centrak, its "Clinical-Grade RTLS™ delivers unmatched accuracy, speed, performance and power-efficiency making it a smarter technology investment."[16] Centrak's "Hand Hygiene Compliance technology provides a cost-effective means of automatically monitoring and capturing compliance and noncompliance events" and generates reports that show visits to hand hygiene stations as well as missed opportunities.[17]

- DebMed – is the healthcare program of the Deb Group located in Charlotte, North Carolina. DebMed offers the DebMed GMS™ electronic hand hygiene monitoring system described as a *"first-of-its-kind electronic hand hygiene monitoring tool, based on an easily deployable wireless platform that does not require any expensive support infrastructure such as radio frequency identification (RFID) or real-time locating system."*[18] According to DebMed, the DebMed GMS™ is *"the world's first group monitoring system to report hand hygiene compliance rates in real-time based on the World Health Organization's "Five Moments for Hand Hygiene" and to date has recorded more than 27 million hand hygiene events."*[19]

- Intelligent InSites – is located in Fargo, North Dakota and claims to be *"the leading provider of operational intelligence for healthcare."*[20] On April 16, 2014, Intelligent InSites announces that Health Insight Capital, a subsidiary of Hospital Corporation of America ("HCA") made an equity investment in Intelligent InSites, and that Chuck Hall, President of HCA's National Group, was

---

[14] http://www.awarepoint.com/company.

[15] http://www.awarepoint.com/solutions/hand-hygiene-monitoring.

[16] http://www.centrak.com/CorporateProfile.aspx.

[17] http://www.centrak.com/SolutionsHHCMonitoring.aspx.

[18] *"Frost & Sullivan Recognizes DebMed's Pioneering Efforts in the Electronic Hand Hygiene Solutions Market,* March 27, 2014, Frost & Sullivan; http://www.frost.com/sublib/display-press-release.do?searchQuery=rtls&ctxixp Link=FcmCtx1&ctxixpLabel=FcmCtx2&id=290046287&bdata= aHR0cHM6Ly93d3c%E2%80%A6.

[19] *Id.*

[20] http://intelligentinsites.com/press_releases/intelligent-insites-announces-investment-by-hca-health-insight-capital.

7

appointed to the Board of Directors of Intellectual InSites.[21] According to Intelligent InSites, its Hand Hygiene system tracks the number of hand cleansing activities and compares them to hand hygiene opportunities. In addition its system reports results and trends by area to raise awareness and drive action.[22]

- Intelligent$^M$ –is a company that designs data-driven hand hygiene compliance improvement solutions for hospitals that dramatically reduce healthcare-acquired infections and their associated costs.[23] The Intelligent$^M$ hand hygiene system is comprised of a SmartBand™ that is linked to a clinician's ID and contains an RFID reader, Bluetooth Low Energy transceiver and accelerometer. If the clinician doesn't sanitize their hands within a specified amount of time after entering a room, the SmartBand™ starts to vibrate and won't stop until the clinician actually sanitizes their hands.[24]

- Radianse – is a corporation located in North Andover, Massachusetts. Radiance provides intelligent solutions for healthcare by automatically collecting and processing real time location data, movement history, associations and relationship information on high-value assets, including equipment, patients and staff.[25] According to Radianse, *"utilizing a combination of tags, integrated gel or soap dispenser sensors and the Radianse skyView software, each patient/staff interaction and room entry/exit event is monitored and recorded and can be correlated with hand-washing events."*[26]

- UltraClenz – A corporation located in Jupiter, Florida, UltraClenz creatively integrates information technology with proper hand hygiene. According to UltraClenz, it is an original equipment manufacturer of touch-fee dispensing and sanitizing solutions. UltraClenz offers an automated hand hygiene monitoring system called Patient Safeguard Systems ("PSS") designed to increase hand hygiene awareness in a healthcare facility. According to UltraClenz, its PSS helps *"prevent the spread of hospital acquired infections by monitoring and modifying clinician behavior to improve hand hygiene compliance."* According to a January 30, 2014 press release by HCA, *"[c]urrently several HCA facilities are*

---

[21] *Id.*

[22] http://intelligentinsites.com/solutions/staff-and-patient-safety.

[23] http://www.intelligentm.com.

[24] http://medtechboston.com/profiles-intelligentm.

[25] http://www.radianse.com/company.html.

[26] http://www.radianse.com/solution_hand_hygiene.html.

>   *testing different systems. Palms West Hospital in Loxahatchee, Fla, has been using the UltraClenz Patient Safeguard System™ with great success."*

13. The availability of these alternative hand hygiene monitoring systems undermines Dr. Reiff's claim that Hill-Rom will sustain losses or otherwise be "harmed" by GE's continued sale of the Accused System during the pendency of this litigation. More specifically, given 1) HCA's April 17, 2014 equity investment in *Intelligent InSites*, 2) HCA's use of UltraClenz's PSS technology in its Palms West Hospital, and 3) the availability of other hand hygiene monitoring systems, Dr. Reiff's claim that Hill-Rom will realize additional sales to HCA in the event an injunction should issue against GE is particularly speculative.

14. Second, Hill-Rom is a large, international corporation with a diverse product portfolio that includes hospital beds, surgical equipment, the Patient Care Module, and the MetaNeb® System.[27] Hill-Rom's 2013 total annual revenue exceeded $1.7 billion.[28] **Figure A** below is a summary I prepared of Hill-Rom's total revenues for the fiscal years ending September 30, 2011, 2012 and 2013. As **Figure A** illustrates, Hill-Rom achieved annual revenues of about $1.6 billion in 2011 and 2012, and more than $1.7 billion in 2013. As **Figure A** indicates, Hill-Rom's estimate of 2013 Relevant Market at $5.0 million represents 0.3% of Hill-Rom's total annual revenues during the years 2011, 2012 and 2013.

---

[27] http://www.hill-rom.com/usa/Products/Products-A-Z/.
[28] Hill-Rom Holdings, Inc. Annual Report on Form 10-K, For the Fiscal Year Ended September 30, 2013, p. 20.

**Figure A**

**The Relevant Market as Percentages of Hill-Rom's Total Revenue**

|  | FY 2011 | FY 2012 | FY 2013 |
|---|---|---|---|
| Total Revenue | $1,591,700,000 | $1,634,300,000 | $1,716,200,000 |
| 2013 Relevent Market | $5,000,000 | $5,000,000 | $5,000,000 |
| *Percentage of Revenue* | *0.3%* | *0.3%* | *0.3%* |

15. Third, the time period at issue here is relatively short. According to a study entitled *U.S. District Courts – Median Time Intervals From Filing to Disposition of Civil Cases* which reports the median time intervals (in months by U.S. District Court) from the filing of a new case to trial,[29] the U.S. District Court for the Eastern District of Virginia ranked first (fastest), at 11.1 months. Thus, any loss that Hill-Rom may possibly sustain as a result of GE's continued sale of the Accused System would be limited to a relatively short period of time.

16. In summary, given the availability of competing systems and the size of Hill-Rom's worldwide business, any loss that Hill-Rom may sustain as a result of GE's continued sale of the Accused System during the anticipated 11.1 month pendency of this litigation would have little, if any, impact on Hill-Rom's current or future business.

## V. THE LOW GROWTH RATES OF THE RELEVANT MARKET

17. Contrary to Dr. Reiff's assertions, the Relevant Market is characterized by low growth rates. According to Mr. Francis Dirksmeier, General Manager, Global Asset Management and Hospital Operations Management for GE Health Care, hospitals and other

---

[29] For the 12-month period ending March 31, 2013.

10

healthcare facilities (such as, for example, continuing care facilities) have been slow to adopt RTLS technologies, and in particular, hand hygiene monitoring systems, due to the tight financial budgets under which healthcare facilities operate.[30]

18. There are 5,723 hospitals in the United States,[31] and 165 hospitals within HCA's network.[32] As of May 2014, GE sold and installed a total of 53 non-accused AgileTrac™ software systems in hospitals around the country, of which 23 were HCA hospitals.[33]

19. According to Mr. Dirksmeier,[34] in May 2009, GE began its hand hygiene compliance development efforts at HCA's Summerville, South Carolina hospital.[35] Since 2009, GE has sold and/or installed only five Accused Systems, four of which were sold to or installed in HCA hospitals.[36] Each of the five Accused Systems sold or installed since May 2009 were to hospitals in which GE's non-accused AgileTrac™ software system had been previously installed.

20. Similarly, according to Hill-Rom, it has only "sold and installed several hand hygiene systems in the United States."[37]

21. Thus, notwithstanding Dr. Reiff's contention, the Relevant Market is not currently experiencing rapid growth.[38] And certainly, the Relevant Market is not growing at such a rate

---

[30] Dirksmeier Decl. ¶ 26.
[31] *Id.* at ¶ 9.
[32] *Id.*
[33] *Id.* at ¶ 9 and ¶ 30.
[34] *Id.* at ¶ 9.
[35] *Id.*; GE realized no revenue from this installation.
[36] *Id.* at ¶ 9.
[37] Memorandum of Law in Support of Plaintiffs' Motion for Preliminary Injunction, p. 5 (emphasis added).
[38] Reiff Decl. ¶ 7.

11

that would impede the quantification of the losses Hill-Rom may sustain, if any, as a result of GE's continued sale of the Accused System during the pendency of this litigation.

## VI. HILL-ROM'S HAND HYGIENE COMPLIANCE SOLUTION DOES NOT DRIVE DEMAND FOR OTHER PRODUCTS

22. Hill-Rom's claim[39] that its Hand Hygiene Compliance Solution drives sales of other Hill-Rom RTLS-based[40] and non-RTLS-based products[41] is unfounded, invalid and otherwise erroneous. Hill-Rom introduced its Hand Hygiene Monitoring Solution system just last year,[42] and promotes this application as a solution which *"can use the same hardware and devices as other Hill-Rom real-time locating solutions"*[43] such as, for example, its Hill-Rom Asset Tracking Solution.

23. Likewise, GE markets and sells the Accused System as an extension to the non-accused AgileTrac™ software system that includes its resource tracking system.[44] In fact, each of the five hospitals in which the Accused System has been installed were previously equipped with GE's non-accused AgileTrac™ software system.[45] Stated differently, at the time of purchase of an Accused System, no hospital was required to also purchase an AgileTrac™ software system, as the AgileTrac™ software system had already been acquired and installed.

---

[39] Memorandum of Law in Support of Plaintiffs' Motion for Preliminary Injunction, p. 22.

[40] Such as, for example, Hill-Rom Asset Tracking Solution systems and TeleTracking asset tracking software. (*See TeleTracking, Hill-Rom Sign RTLS Cross Selling Agreement,* March 20, 2014, TeleTracking website at http://www.teletracking.com/news/index.cfm?mode=detail_news&news=96B06F3F-1372-5B6F-0BB4D87DF906CCAB.)

[41] Such as, for example, hospital beds and NaviCare® Nurse Call system.

[42] On June 11, 2013.

[43] "Hill-Rom Launches New Hospital Hand Hygiene Monitoring Solution," June 11, 2013, Hill-Rom.

[44] The AgileTrac™ suite of products include asset, staff, and patient tracking via RTLS technologies. (*See* http://www3.gehealthcare.com/en/Services/Hospital_Operations_Management/AgileTrac#tabs/tabB6FEB6824759477485CA7D2FE016ADED.)

[45] Dirksmeier Decl. ¶ 25.

24. Hill-Rom's Hand Hygiene Compliance Solution and GE's Accused System are both add-on modules which hospitals may chose to utilize after adopting RTLS technologies. Therefore, these applications do not drive sales of Hill-Rom's other RTLS-related or non-RTLS-related products. To the contrary, sales of Hill-Rom's Hand Hygiene Compliance Solution and the Accused System are dependent upon and, in fact, driven by RTLS-related technology.[46] Accordingly, Dr. Reiff's claims that Hill-Rom's Hand Hygiene Compliance Solution and GE's Accused System drive sales of other products is unfounded, invalid and otherwise erroneous.

25. Hill-Rom asserts that each lost sale of its Hand Hygiene Compliance System will result in lost revenue for ongoing maintenance and consulting services.[47] First, I note that Hill-Rom has provided no substantive proof that it indeed generates significant maintenance and consulting fees related to its Hand Hygiene Compliance System. However, if Hill-Rom is able to demonstrate these facts, it will be an easy exercise to determine the amount of lost revenues and lost earnings relating to these alleged lost services.

## VII. HILL-ROM'S ALLEGED "HARM" TO GOODWILL AND REPUTATION IS SPECULATIVE

26. Hill-Rom's alleged "harm" to its goodwill and reputation is speculative and unsubstantiated. Hill-Rom is well known in the healthcare industry for other healthcare-related products such as, for example, Hill-Rom hospital beds and the NaviCare® Nurse Call systems. Hill-Rom's reputation or "standing" within the healthcare industry and its customer relationships are not dependant upon Hill-Rom's sale of its Hand Hygiene Compliance Solution.

27. In addition, there is no evidence that Hill-Rom has sustained a loss of goodwill.

---

[46] Discussion with Francis Dirksmeier.
[47] Memorandum of Law in Support of Plaintiffs' Motion for Preliminary Injunction, p. 22.

Hill-Rom evaluates the carrying value of its goodwill on an annual basis. According to Hill-Rom's 2013 Form 10-K:

> We perform an impairment assessment on goodwill and other indefinite-lived intangibles annually during the third fiscal quarter, or whenever events or changes in circumstances indicate that the carrying value of a reporting unit may not be recoverable. . . .[48]
>
> *The qualitative goodwill impairment assessment requires evaluating factors to determine that a reporting unit's carrying value would not . . . exceed its fair value. . . . [F]actors that were considered included the results of the most recent impairment test, current and long-range forecasted financial results, and changes in the strategic outlook or organization structure of the reporting units.*[49]

28. **Figure B** below is an excerpt from a table in Hill-Rom's 2013 Form 10-K which illustrates the reported Goodwill and the Accumulated Impairment Losses for Hill-Rom's North America operating segment for its fiscal years ending September 30, 2011, 2012 and 2013. As **Figure B** below illustrates, Hill-Rom has reported no increase in accumulated impairment losses since at least September 30, 2011, which is prior to Hill-Rom's introduction of its Hand Hygiene Compliance Solution.[50]

---

[48] Hill-Rom Holdings, Inc. Annual Report on Form 10-K, For the Fiscal Year Ended September 30, 2013, p. 32.
[49] *Id.*
[50] Hill-Rom's Forms 10-Q for the quarters ending December 31, 2013 and March 31, 2014 likewise do not reflect any increase in Hill-Rom's Accumulated Impairment Losses for its North America business segment.

**Figure B**

**Hill-Rom's Goodwill Activity for the North American Business Segment**

|  | North America |
|---|---|
| **Balances at September 30, 2011:** |  |
| Goodwill | 383.0 |
| Accumulated impairment losses | (358.1) |
| Goodwill, net at September 30, 2011 | 24.9 |
| **Changes in Goodwill during the period:** |  |
| Goodwill related to acquisition | - |
| Currency translation effect | - |
| **Balances at September 30, 2012:** |  |
| Goodwill | 383.0 |
| Accumulated impairment losses | (358.1) |
| Goodwill, net at September 30, 2012 | 24.9 |
| **Changes in Goodwill during the period:** |  |
| Goodwill related to acquisition | - |
| Currency translation effect | - |
| **Balances at September 30, 2013:** |  |
| Goodwill | 383.0 |
| Accumulated impairment losses | (358.1) |
| **Goodwill, net at September 30, 2013** | $ 24.9 |

29. In addition, there is no evidence of a decline in the price of Hill-Rom's common stock (ticker symbol: "HRC") since Hill-Rom's introduction of its Hand Hygiene Compliance Solution which could possibly be reflective of GE's continued sale of the Accused System. In fact, Hill-Rom's common stock price increased from about $30 per share as of the beginning of 2013, to nearly $40 per share as of May 30, 2014, representing an increase of more than 30%.

## VIII. THE RECOVERY OF DAMAGES PROVIDES AN ADEQUATE LEGAL REMEDY

30. Hill-Rom's statements concerning the alleged "irreparable" nature of the "harm" it asserts could result from GE's continued sales of the Accused System are unsupportable in light of 35 U.S.C. § 284 and relevant case law. According to 35 U.S.C. § 284:

> *Upon finding for the claimant the court shall award the claimant damages adequate to compensate for the infringement, but in no event less than a reasonable royalty for the use made of the invention by the infringer, together with interest and costs as fixed by the court.*[51]

31. Under the facts and circumstances alleged here, federal courts have expressly provided for the recovery of the very types of losses Hill-Rom claims it would sustain as a result of GE's continued sale of the Accused System. In my opinion, there is nothing unique about Hill-Rom's Hand Hygiene Compliance Solution or the healthcare industry that would preclude Hill-Rom from fully recovering its claimed losses should the Court decide that the Patents-in-Suit are valid and infringed and damages are appropriate.

32. I understand that the Federal Circuit has affirmed damages awards based on a large variety of theories where the patentee has presented reliable economic evidence of "but-for" causation.

33. In my experience, damages awards issued by federal courts for infringement of US patents can include a variety of remedies, when proven, including lost profits, reasonable royalty, and price erosion.

34. In summary, federal courts have given patentees, like Hill-Rom, significant latitude to prove and recover damages for a wide variety of foreseeable economic effects of infringement upon the introduction of sound, reliable economic evidence.

35. Such economic evidence is available to Hill-Rom. I understand that GE keeps records of its sales on an individual product and customer basis.[52] In the event that GE continues to sell the Accused System and is later found to infringe a valid claim of the Patents-in-Suit,

---

[51] 35 U.S.C. § 284.
[52] Dirksmeier Decl. ¶ 23.

16

information concerning GE's sales would be available to evaluate Hill-Rom's damages.

36.     Given the significant latitude provided by the federal courts and the availability of economic evidence, it is my opinion that an award of monetary damages would fully compensate Hill-Rom for any losses in the event of a future finding of infringement of any valid and enforceable claim of the Patents-in-Suit.

Pursuant to 28 U.S.C. §1746, I declare under penalty of perjury that the foregoing is true and correct.


James E. Malackowski
Executed on June 20, 2014.

Dated: June 23, 2014

                                          Respectfully submitted,

By: */s/ Robert M. Tata*
    Robert M. Tata (VSB #30101)
    Wendy C. McGraw (VSB #37880)
    HUNTON & WILLIAMS LLP
    500 E. Main Street, Suite 1000
    Norfolk, VA 23510
    (757) 640-5300
    (757) 625-7720 *fax*
    btata@hunton.com
    wmcgraw@hunton.com

    David J. Lender (*pro hac vice*)
    WEIL, GOTSHAL & MANGES LLP
    767 Fifth Avenue
    New York, NY 10152
    (212) 310-8000
    (202) 833-3035 *fax*
    david.lender@weil.com

    Brian E. Ferguson (*pro hac vice*)
    Robert T. Vlasis, III (*pro hac vice*)
    WEIL, GOTSHAL & MANGES LLP
    1300 Eye Street, N.W., Suite 900
    Washington, DC 20005
    (202) 682-7000
    (202) 867-0940 *fax*
    brian.ferguson@weil.com
    robert.vlasis@weil.com

    *Attorneys for General Electric Company*

## CERTIFICATE OF SERVICE

I hereby certify that on June 23, 2014, I will electronically file the foregoing with the Clerk of Court using the CM/ECF system, which will then send a notification of such filing (NEF) to the following:

Stephen E. Noona, Esq.
Lauren Tallent Rogers, Esq.
KAUFMAN & CANOLES, P.C.
150 West Main Street, Suite 2100
Norfolk, VA   23510
senoona@kaufcan.com
ltrogers@kaufcan.com

J. Michael Showalter, Esq.
SCHIFF HARDIN LLP
233 S. Wacker Drive, Suite 6600
Chicago, IL   60606
mshowalter@schiffhardin.com

Stacie R. Hartman, Esq. *(pro hac vice)*
A. Taylor Corbitt, Esq. *(pro hac vice)*
SCHIFF HARDIN LLP
233 S. Wacker Drive, Suite 6600
Chicago, IL   60606
shartman@schiffhardin.com
tcorbitt@schiffhardin.com

Stephen M. Haskins, Esq. *(pro hac vice)*
SCHIFF HARDIN, LLP
One Market
Spear Street Tower, Thirty-Second Floor
San Francisco, CA   94105
shankins@schifflardin.com

Samuel D. Almon, Esq. *(pro hac vice)*
SCHIFF HARDIN, LLP
One Atlantic Center, Suite 2300
1201 West Peachtree Street
Atlanta, GA   30309
salmon@schiffhardin.com

*Attorneys for Plaintiffs Hill-Rom Company, Inc.
Hill-Rom Services, Inc. and Hill-Rom Manufacturing, Inc.*

*/s/ Robert M. Tata*
Robert M. Tata (VSB #30101)
HUNTON & WILLIAMS LLP
500 E. Main Street, Suite 1000
Norfolk, VA   23510
(757) 640-5300
(757) 625-7720 *fax*
btata@hunton.com

*Attorney for General Electric Company*