IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
NORFOLK DIVISION

| | |
|---|---|
| HILL-ROM COMPANY, INC., HILL-ROM MANUFACTURING, INC., and HILL-ROM SERVICES, INC.<br><br>Plaintiff,<br><br>v.<br><br>GENERAL ELECTRIC COMPANY,<br><br>Defendant. | Case No. 2:14-cv-187 |

**REPLY DECLARATION OF ADAM MCMULLIN**

Adam McMullin, pursuant to 28 U.S.C. § 1746, declares as follows:

1. I am Vice President and General Manager of Hill-Rom Clinical Work Flow Solutions at Hill-Rom Manufacturing, Inc. (together with Hill-Rom Company, Inc. and Hill-Rom Services, Inc., "Hill-Rom"). I have personal knowledge of the facts set forth herein unless otherwise stated and, if called as a witness, would competently testify to such facts.

2. In its response to Hill-Rom's Motion for Preliminary Injunction, GE argues that Hill-Rom delayed in bringing this lawsuit, but based on my personal knowledge, that is not accurate.

3. Hill-Rom learned in the Spring of 2013 that the HCA hospital in Summerville, South Carolina had installed for testing a version of GE's AgileTrac hand hygiene compliance system.

4. After that time and through its investigation, Hill-Rom determined that the GE system had many features claimed in patents held by Hill-Rom. It is noteworthy that the Summerville GE installation was a testing site and very much a "work-in-progress." I

1

understand that HCA employees noted that various features were being changed based on customer feedback and based on various "bugs" reported in the systems operation. For example, I understand that HCA reported that badges worn by various personnel were responding erroneously to proximity locators contained through walls in adjacent patient rooms. We have been informed of other changes to the GE system that apparently continue to this day. For example, GE's expert Professor Tsouri reported that he was unable to see updated dashboards of information in his inspection at the Summerville facility. However, I understand that Hill-Rom saw this very updating occur in March 2014 when we examined the Summerville installation as it existed then.

     5.     Hill-Rom continued its efforts to sell to HCA in the Fall of 2013 – and continues to do so today. I estimate that in January 2014 we had learned that the HCA-GE contract had progressed to the point that Hill-Rom was at risk of not being able to sell to RTLS and Hand Hygiene to due to the commitment at HCA to test GE hand hygiene systems and possibly purchase them should they prove to be robust. Shortly after that time, Hill-Rom made the decision to enforce its patents despite the possible disruption that a lawsuit would have on our valued customer HCA. After this decision, we searched for experts that could assist us in confirming our suspicion of infringement. Professor Felder was retained in March 2014 and we arranged for his inspection ████████████████████████████████████. During that inspection, Professor Felder confirmed our suspicions and the company began preparing its complaint and preliminary injunction papers that catalog in detail the patent claims and functionalities that we determined infringed those claims. GE appears to argue this delay was unreasonable. From my perspective, Hill-Rom moved quickly and carefully in conducting its

due diligence before bringing this matter to the Court and engaging in litigation with a large company that could disrupt a valued customer.

6. Competition from GE caused Hill-Rom to lose a sale of its hand hygiene compliance system to ███████████████████████████, an HCA hospital, in the Fall of 2013. ███████████████ planned to purchase a Hill-Rom hand hygiene compliance system, but cancelled the order on the basis that HCA management had instructed them to use GE's hand hygiene compliance system.

7. GE argues that it is one of many competitors in the group of hand hygiene monitoring system suppliers, but the companies it names do not offer products similar to Hill-Rom and GE, and/or in my experience have not competed for the same type of contracts as Hill-Rom and GE.

8. Mr. Dirksmeier lists ███████████████ as competitors of Hill-Rom. By doing so, he double counts, as ███████████████ are a single company following their merger in 2012. More importantly, their system relies on technology and licenses from others to accommodate separate parts of the system (such as wifi and ultrasound). Many customers view this as less suited for hand hygiene solutions.

9. ███████ product is distinguishable from the systems sold by Hill-Rom and GE because the ███████ system does not have the ability to work with hospitals' existing soap or sanitizer dispensers; rather, ███████ requires installation of its proprietary automated dispenser. To customers, that is a significant limitation and a disincentive to use ███████ system.

10. Further distinguishing them from Hill-Rom and GE, neither ███████ nor ███████████████ offers a similar breadth of related products, which hospitals regularly need to purchase. This makes them far less competitive in attempting to sell to the large networks of

3

hospitals known as Integrated Delivery Networks ("IDNs"), because HCA and other IDNs have an incentive to use as few suppliers as possible and therefore prefer to buy from companies that offer many types of products that are complementary and that can platform off one another. By sourcing from just a few suppliers, IDNs gain leverage and have an increased ability to obtain discounts from their suppliers while streamlining their supplier management.

11. ▮▮▮▮ also is unlike Hill-Rom and GE, because it is solely a hand-hygiene company and therefore is not in the same position to compete for large IDN contracts. The same is true of ▮▮▮▮ ▮▮▮▮ ▮▮▮▮, ▮▮▮▮ ▮▮., ▮▮▮▮, and ▮▮▮▮. For the reasons I already described, such companies do not pose the same competitive threat as GE, particularly in pursuing business from significant IDNs.

12. ▮▮▮▮ does not use any RTLS in its system; rather, it uses predictive modeling. Therefore it does not operate in the same product market as Hill-Rom and GE.

13. I am not familiar with ▮▮▮▮, ▮▮▮▮ or ▮▮▮▮, and am not aware of any instance in which they have competed against Hill-Rom for hand hygiene compliance business.

14. ▮▮▮▮ lacks a sales channel comparable to a company such as Hill-Rom or GE, and therefore is not viewed as a competitive threat in the marketplace. I am not aware of any instances in which Hill-Rom has competed against ▮▮▮▮ for hand hygiene compliance system sales.

15. ▮▮▮▮ does not offer a comprehensive hand hygiene solution. It sells only software, and I am not aware of any hospitals in which it is installed.

16. ▮▮▮▮ does not offer a comprehensive solution either. It does not sell software and instead must partner with a supplier like Hill-Rom or GE, which it does with both

4

companies. I am not aware of any instances in which ▉ has competed against Hill-Rom for hand hygiene compliance system sales, and it is not known for hand hygiene compliance.

17. ▉ has not successfully commercialized a product that would be competitive at the level of robustness required by IDNs such as HCA.

18. ▉ offers a different product than Hill-Rom and GE. Unlike the RTLS-based hand hygiene compliance technology (which is also embodied in GE's product), ▉ does not track caregiver locations throughout a hospital and does not utilize a full-fledged RTLS that includes asset tracking and other functionality. In the hand hygiene compliance industry, ▉ is viewed as a lower-end solution that is used by hospitals that are not ready to install a full-scale, robust RTLS system.

19. Based on my knowledge of HCA's use of ▉, HCA plans to use ▉ in hospitals that are not ready for a full RTLS system. In hospitals that are ready to adopt a full RTLS platform, HCA plans to use either Hill-Rom or GE.

20. GE asserts that it has installed only five hand hygiene compliance systems with HCA. But HCA has told me that is in the process of testing GE's hand hygiene and RTLS systems expressly to make the determination of whether to install GE's hand hygiene product. Mr. Dirksmeier states in paragraph 9 of his declaration that HCA has installed AgileTrac in 23 of its hospitals.

21. GE states that hand hygiene does not drive sales of RTLS or other products, but I am aware of specific instances in which Hill-Rom has relied upon its hand hygiene compliance system module to drive the sale of its RTLS and other products.

22. For example, Hill-Rom is currently bidding for a large contract to become a supplier to the IDN ▉. I am aware that GE is bidding for the same contract.

5

23. The contract is to supply RTLS, hand hygiene, and asset tracking to ▮ ▮. The contract is worth approximately $15 million.

24. In competing for this contract, Hill-Rom is leading with its hand hygiene compliance system, which is a product that differentiates Hill-Rom from its competitors. Hill-Rom trains its sales personnel to focus on the hand hygiene system, because its competitors do not have a vertically integrated hand hygiene compliance system comparable to Hill-Rom's.

25. The ▮ contract is a good example of how hand hygiene can drive sales of Hill-Rom's RTLS and other products. Initially, Hill-Rom was not invited to bid for the ▮ contract. After Hill-Rom presented its hand hygiene compliance system to ▮, ▮ invited Hill-Rom to bid for the contract.

26. Similarly, in bidding for other contracts, Hill-Rom has emphasized its hand hygiene product because it is a point of differentiation from competitors, and it can also lead to sales of Nurse Call and other RTLS-based products.

27. ▮ is a significant contract not only because it involves supply to 27 hospitals, but also because it is for an IDN that makes purchasing decisions on a centralized basis. Not all IDNs make decisions on a centralized basis, but if a supplier wins a contract for an IDN that does employ centralized decision making, it can lead to a huge sale. An IDN might have more hospitals, but if it does not make centralized purchasing decisions, that IDN is not as significant from the point of view of a supplier, because it does not present the opportunity to make a single large sale to many hospitals.

28. As explained in my initial declaration, HCA is another significant IDN, and HCA is moving toward a centralized decision making model like ▮.

29. GE has argued that its total revenues from hand hygiene over the past five years are less than $400,000. But the ▬▬▬▬▬ contract, for which GE is competing against Hill-Rom, would represent a single sale worth approximately $15 million. I am informed that of that $15 million, approximately ▬▬▬▬▬ is allocated to the hand hygiene compliance software and training, while another ▬▬▬▬▬ is allocated to the RTLS hardware, which powers the hand hygiene compliance system.

30. The ▬▬▬▬▬ example shows that GE is actively striving to increase its market share in the RTLS-based hand hygiene compliance market, that hand hygiene sales can drive sales of a company's RTLS system (indeed, Hill-Rom's hand hygiene presentation opened the door for Hill-Rom to bid for the RTLS contract), and that a single contract can involve many millions of dollars.

31. Based on my knowledge of the hand hygiene compliance system market, it appears to be at an inflection point, with more and more IDNs now choosing to commit to a hand hygiene compliance system supplier. ▬▬▬▬▬ is expected to make its decision in approximately 90 days. Its decision will lock it into a contract with a single supplier for a several years, which is approximately 8 to 15 years based on the lifespan of these systems. Other IDNs are also in the process of making large-scale, long-term decisions regarding suppliers of hand hygiene compliance systems.

32. I am aware of numerous other IDNs that are currently soliciting bids to supply RTLS-based hand hygiene systems across numerous hospitals, and for which both Hill-Rom and GE are currently competing. There are several such bids of a size equal to or larger than the ▬▬▬ bid, which together represent an opportunity estimated to be over $100 million.

Several of these accounts will choose a vendor by September 2014; the remainder are expected to choose a vendor by September 2015.

33. Contrary to GE's attempt to portray the market as slowly developing and involving only a few hundred thousand dollars, the market will be awarding contracts worth hundreds of millions of dollars over approximately the next year. Once these contracts are awarded, the customer will almost certainly stick with its chosen supplier for the life of the product, which is approximately 8 to 15 years.

34. GE says that any hand hygiene system can be installed on any existing RTLS system with the use of adapters, but this is inaccurate. First, Hill-Rom's hand hygiene technology (as deployed by both Hill-Rom and GE) requires room-level locating. Therefore, it requires a dense infrastructure in order to capture room events. Hospitals that employ non-Hill-Rom RTLS systems would need additional infrastructure to support hand hygiene, including monitors, staff badges, dispenser monitors, and in some cases, licensing. This would all entail substantial cost to the customer, and is a reason that customers are less likely to purchase Hill-Rom's hand hygiene product if a different company's RTLS is currently installed.

35. While it is technically possible to use an "adapter" to install one company's hand hygiene compliance product on another company's RTLS, integrating the adapter is costly. Beyond creating the adapter, a tremendous amount of adjusting and testing would be required to ensure proper operation. For example, data from the adapter would have to be sent to the hand hygiene system; hardware would likely need to be changed out; the entire system would have to be tuned to ensure proper levels of accuracy; and testing would then be required to confirm proper operation. This would be a difficult, lengthy, and expensive process.

Thus, as a practical matter, there are both economic and cultural barriers to changing from one hand hygiene compliance provider to another through the "adapter" proposed by GE.

36. Aside from the costs of changing the infrastructure, customers make significant investments in training their staff on the use of a particular hand hygiene compliance system. Once an entire hospital has been trained to use one system, changing to another system would be both expensive (in terms of additional required training) and disruptive.

37. This is a critical time for Hill-Rom to compete for market share, but it is being forced to compete against its own inventions, contained in GE's product. Hill-Rom is being harmed by GE's infringement, and faces additional harm over the next six to twelve months as IDN after IDN decides which hand hygiene compliance system to purchase and maintain over the next 8 to 15 years.

I declare under penalty of perjury that the foregoing is true and correct. Executed on July 2, 2014.

*Adam P. McMullin*

_____

Adam McMullin

Dated: July 3, 2014                    Respectfully submitted,

/s/ *Stephen E. Noona*
Stephen E. Noona
Virginia State Bar No. 25367
Lauren Tallent Rogers
Virginia State Bar No. 82711
KAUFMAN & CANOLES, P.C.
150 West Main Street, Suite 2100
Norfolk, Virginia 23510
Telephone: 757-624-3000
Facsimile: 757-624-3169
senoona@kaufcan.com
ltrogers@kaufcan.com

J. Michael Showalter
Virginia State Bar No. 72272
Stacie R. Hartman (*pro hac vice*)
A. Taylor Corbitt (*pro hac vice*)
SCHIFF HARDIN LLP
233 S. Wacker Drive, Suite 6600
Chicago, IL  60606
Telephone:  312-258-5500
Facsimile:  312-258-5600
shartman@schiffhardin.com

Stephen M. Hankins (*pro hac vice*)
SCHIFF HARDIN, LLP
One Market
Spear Street Tower, Thirty-Second Floor
San Francisco, CA  94105
Telephone:  415-901-8700
Facsimile:  415-901-8701
shankins@schifflardin.com

Samuel D. Almon (*pro hac vice*)
SCHIFF HARDIN, LLP
One Atlantic Center, Suite 2300
1201 West Peachtree Street
Atlanta, GA  30309
Telephone:  404-437-7000
Facsimile:  404-437-7100
salmon@schiffhardin.com

*Attorneys for Plaintiffs Hill-Rom Company, Inc., Hill-Rom Services, Inc. and Hill-Rom Manufacturing, Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that on July 3, 2014, I will electronically file the foregoing with the Clerk of the Court using the CM/ECF system, which will send a notification of such filing (NEF) to the following:

    Robert M. Tata
    Virginia State Bar No. 30101
    Wendy C. McGraw
    Virginia State Bar No. 37880
    Sonja Garrelts
    Virginia State Bar No. 83226
    HUNTON & WILLIAMS LLP
    500 E. Main Street, Suite 1000
    Norfolk, VA 23510
    Telephone: 757-640-5300
    Facsimile: 757-625-7720
    btata@hunton.com
    wmcgraw@hunton.com
    sgarrelts@hunton.com

    David J. Lender *(pro hac vice)*
    WEIL GOTSHAL & MANGES LLP
    767 Fifth Avenue
    New York, NY 10153-0119
    Telephone: 212-310-8153
    Facsimile: 212-833-3035
    David.lender@weil.com

    Brian E. Ferguson *(pro hac vice)*
    Robert T. Vlasis, III *(pro hac vice)*
    Stephen P. Bosco
    Virginia State Bar No. 86129
    WEIL GOTSHAL & MANGES LLP
    1300 Eye Street, N.W., Suite 900
    Washington, DC 20005
    Telephone: 202-682-7000
    Facsimile: 202-857-0940
    Brian.ferguson@weil.com
    Robert.vlasis@weil.com
    Stephen.bosco@weil.com

    *Counsel for Defendant General Electric Company*

*/s/ Stephen E. Noona*
Stephen E. Noona
Virginia State Bar No. 25367
KAUFMAN & CANOLES, P.C.
150 West Main Street, Suite 2100
Norfolk, Virginia 23510
Telephone: 757-624-3000
Facsimile: 757-624-3169
senoona@kaufcan.com