# Exhibit 1

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
NORFOLK DIVISION**

| | | |
|---|---|---|
| HILL-ROM COMPANY, INC., <br> HILL-ROM MANUFACTURING, INC., <br> and HILL-ROM SERVICES, INC. | ) <br> ) <br> ) <br> ) | |
| Plaintiff, | ) | Case No. 2:14-cv-187-RGD-LRL |
| v. | ) <br> ) | |
| GENERAL ELECTRIC COMPANY, | ) <br> ) | **DECLARATION OF** <br> **ROBERT MACKLIN** |
| Defendant. | ) <br> ) | |

Robert L. Macklin, pursuant to 28 U.S.C. § 1746, declares as follows:

1.     I am Vice President, Associate General Counsel and Assistant Secretary for Hill-Rom Services, Inc. ("HRS"). I have personal knowledge of the facts set forth herein unless stated otherwise and, if called as a witness, would competently testify to such facts.

2.     I understand that at the July 7 hearing in this matter the Court inquired as to whether HRS, Hill-Rom Company, Inc. ("HRC"), and Hill-Rom Manufacturing, Inc. ("HRM," together with HRS and HRC, "Hill-Rom") file a single consolidated tax return. I have confirmed that these entities, which are affiliates of one another, do file a single consolidated tax return.

3.     I am familiar with the agreements by which HRS has licensed U.S. Patent Nos. 6,727,818, 7,408,470, and 8,368,544 (the "Asserted Patents").

4.     In response to the inquiry by the Court at the July 7 hearing, I have confirmed that HRC and HRM are the sole and exclusive licensees to the Asserted Patents within their respective fields of use. Although the agreements with HRC and HRM use the term "nonexclusive," these agreements are in fact exclusive. HRS has not licensed to any entity other than HRC the rights to sell, distribute or market the hand hygiene compliance systems in the United States described in the Asserted Patents (except as to suppliers to Hill-Rom), and has no

intent to do so.  HRS has not licensed to any entity other than HRM the rights to make or have made the hand hygiene compliance systems in the United States described in the Asserted Patents (except as to suppliers to Hill-Rom), and has no intent to do so.  The licenses include the right for HRC and HRM to enforce the Asserted Patents as co-parties (Sections 6.17 and 6.18, respectively, in the attached agreements), and require their consent in settling any such litigation.

5.      Attached as Exhibit A is a true and correct copy of the Sales and Distribution Agreement between HRS and HRC dated March 26, 2000.  Section 2.2(n) provides HRC with the rights to use the Intellectual Property Assets owned by HRS "in connection with the selling, distribution and marketing of the products sold" by HRC in accordance with the terms and conditions of the Agreement.  The Asserted Patents are among the Intellectual Property Assets included in this license.

6.      Attached as Exhibit B is a true and correct copy of two Product Supply Agreements (the substance is the same in each), between HRS and Hill-Rom, Inc. and between HRS and Hill-Rom Air-Shields, Inc., each dated March 26, 2000.  HRM acquired these agreements as a successor to both companies as part of a corporate restructuring in 2009. Section 2.1(i) provides HRM with the rights to use the Intellectual Property Assets owned by HRS "in connection with the manufacturing, having manufactured and sourcing of the products manufactured" by HRM in accordance with the terms and conditions of the agreements.  The Asserted Patents are among the Intellectual Property Assets included in this license.

7.      Section 2.2(n) of the Sales Agreement includes a typographical error in the third line in referring to "HRS" instead of "HRC."

I declare under penalty of perjury that the foregoing is true and correct.

Executed on July 14, 2014                    _____

Robert L. Macklin

2

# Exhibit A

# SALES AND DISTRIBUTION AGREEMENT

THIS AGREEMENT is entered into effective March 26, 2000, (the "Effective Date"), by and between Hill-Rom Services, Inc., a Delaware corporation ("HRS") and Hill-Rom Company, Inc., an Indiana corporation ("HRC").

## RECITALS

WHEREAS, HRS is a seller of hospital equipment and other related products;

WHEREAS, HRC desires to purchase such products from HRS for the purpose of resale;

WHEREAS, HRS desires to sell such products to HRC;

WHEREAS, HRS desires to provide certain services to HRC and HRC desires to provide certain services to HRS;

WHEREAS, HRS is the owner of certain patents, tradenames, trademarks, copyrights and know-how ("Intellectual Property Assets") related to the products sold by HRS, and HRC desires to obtain, and HRS is willing to grant, the herein-contained non-exclusive, worldwide rights under the Intellectual Property Assets to sell, distribute and market the products sold by HRS.

NOW, THEREFORE, in consideration of the mutual covenants and conditions contained herein and intending to be legally bound, the parties hereby agree as follows:

## ARTICLE I
## APPOINTMENT AS DISTRIBUTOR

**Section 1.1.** **Appointment.** HRS hereby agrees to designate HRC as a distributor on a worldwide basis of products purchased from HRS. The products covered by this agreement include all products manufactured and /or acquired for resale by HRS.

**Section 1.2.** **Acceptance.** HRC hereby agrees to become a distributor on a worldwide basis of products purchased from HRS.

**Section 1.3.** **Nature of Relationship.** The relationship established between HRS and HRC by this Agreement is that of seller and purchaser. Under this agreement, HRC shall not have the right to assume or create any obligation of any kind, either express or implied, on behalf of HRS, except as expressly provided for in this Agreement.

## ARTICLE II
## RESPONSIBILITIES

**Section 2.1.** **Of HRC.** HRC shall at all times during the term of this Agreement:

a. Assume all market risk relating to the goods and products, where market risk refers to the risk that the goods and products will not sell in the market;

b. Actively and diligently promote the sale of products purchased from HRS by, among other things, solicitation of inquiries and calls on customers and prospective customers to obtain inquiries and by rendering such services as may be required to present and sell products purchased from HRS;

1

c.  Provide service for existing and potential customer accounts on a regular basis consistent with good business practice;

d.  Cooperate with and represent HRS in promotional efforts;

e.  Maintain a sales office or offices that shall be open during normal business hours;

f.  Facilitate communications by and between HRS and customers or prospective customers regarding HRS product inquiries, orders, delivery schedules, quality, service, administrative, or other matters;

g.  Furnish to HRS such reports and information relating to the purpose of this Agreement (which includes but is not limited to sales activities, market prices, products and strategies of competitors, possible new products, future customer needs, market trends, and related matters) that may reasonably be requested from time to time by HRS during the term of this Agreement;

h.  Immediately notify HRS in writing of any claim that a good or product or trademark infringes any patent, trademark, copyright, trade secret or similar law in order to allow HRS to defend such claims;

i.  HRC shall use such intellectual property notices and/or markings in the conduct of its business in connection with the selling, distribution and marketing of the products sold by HRS as are deemed advisable by HRS;

j.  Provide full information to HRS related to the amount of and type of product to be purchased from HRS in a timely manner. This includes, but not limited to, sharing forecast information, forecast update information and firm order commitment information as this information becomes available to HRC; and,

k.  Provide to HRS the services, to the extent requested in the Corporate Services Agreement, dated March 26, 2000, between HRS and HRC.

**Section 2.2.**   **Of HRS.** HRS shall at all times during the terms of this Agreement:

a.  Assume no market risk, where market risk refers to the risk that the goods and products will not sell in the market;

b.  Provide to HRC, full information with respect to all product specification changes;

l.  Assume responsibility for all costs and risks related to the purchase of products to be sold to HRC not expressly assumed by HRC under this agreement;

m.  Acquire and hold title to all Intellectual Property Assets, know-how and improvements;

n.  Provide HRC non-exclusive worldwide rights to use and to disclose to others the know-how, including the copyrights, included in the Intellectual Property Assets in connection with the selling, distribution and marketing of the products sold by HRS in accordance with the terms and conditions of this Sales and Distribution Agreement; provided, however, that such use and disclosure are consistent with HRC's confidentiality obligations set forth in Section 6.12. hereof;

o.  HRS hereby represents and warrants to HRC that HRS has means, capacity and wherewithal to procure, register, maintain and enforce the Intellectual Property Assets,

2

and to exercise adequate quality control over HRC's use of the Intellectual Property Assets to a degree reasonably necessary to ensure the continued validity and enforceability of the Intellectual Property Assets, and the goodwill associated therewith;

p.     Anything in this Agreement to the contrary notwithstanding, HRS does not represent or warrant to HRC that the products sold by HRC are free from infringement of the Intellectual Property Asset rights of third parties;

q.     Provide to HRC the services, to the extent requested in the Corporate Services Agreement, dated March 26, 2000, between HRC and HRS; and,

e.     Reimburse HRC for all warranty costs incurred by HRC as a result of selling product to customers purchased from HRS.

## ARTICLE III
## TERMS OF SALE

**Section 3.1.**     **Sale of Products.** HRC shall order from HRS, and HRS shall supply, such products as HRC shall desire from HRS pursuant to such procedures as HRS shall periodically specify.

**Section 3.2.**     **Pricing.** HRC shall purchase such products at such prices as set by HRS. Such prices shall include compensation for any and all services rendered between the parties as outlined within any Article within this Agreement.

**Section 3.3.**     **Shipment Confirmation.** HRS shall advise HRC of all shipments of HRS products in a timely manner, giving the description, quantity, purchase order number, and other pertinent information. HRS will coordinate the shipping, timing, and product mix to the appropriate HRC storage location.

**Section 3.4.**     **Payment Terms.** HRC shall pay all HRS charges no later than 60 days from the date of shipment of the products purchased from HRS to HRC's customers. All HRS charges shall be paid in full without any deductions or credits of any kind. Any requests for credit or deduction by HRC (e.g., due to shortage in shipment quantity, quality defects, damage in transit, or related matters), shall be processed in the form of a separate charge to HRS.

**Section 3.5.**     **Delivery, Title, Risk of Loss, Expenses.**
*Product Supplied to HRS by HRM or HRI* - The parties agree that title to products purchased from HRS by HRC which are supplied to HRS by either Hill-Rom Manufacturing, Inc. (HRM) or Hill-Rom, Inc. (HRI) shall shift to HRC at the HRM or HRI manufacturing facility which supplies the product to HRS. All risk of loss to such product shall shift to HRC at the HRM or HRI manufacturing facility. HRC shall be responsible for all freight, transportation, customs, duties, and other costs of transporting such product purchased from HRS, from HRM's or HRI's manufacturing facilities to such destination as HRC shall ultimately determine, even when such shipping arrangements are made by an entity other than HRC.

*Product Not Supplied to HRS by HRM or HRI* - The parties agree that title, possession and control to products purchased from HRS by HRC which are not supplied to HRS by HRM or HRI shall shift from HRS to HRC immediately upon delivery of such product to a warehouse location specified by HRS, by the selling party, or its representative. All risk of loss to such product shall shift to HRC at the warehouse location . HRC shall be responsible for all freight, transportation, customs, duties, and other costs of transporting such product purchased from HRS, from the warehouse location to such destination as HRC shall ultimately determine, even when such shipping arrangements are made by an entity other than HRC.

## ARTICLE IV
## WARRANTIES AND REPRESENTATIONS

3

**Section 4.1.   HRS WARRANTIES.** HRS warrants that:

a.   It has the right to transfer full unencumbered title to all product it sells to HRC under the terms of this Agreement;

b.   It will extend to HRC all standard HRS warranties that apply to the products

c.   It has the right and authority to enter into this Agreement.

d.   It has the ability to fulfill HRC's orders.

**Section 4.2.   HRC WARRANTIES.** HRC warrants that:

a.   It has the right and authority to enter into this Agreement; and

b.   Will advise HRS of any claim for damages or breach of warranty with respect to products it purchases from HRS asserted by it or a customer purchasing such products.

## ARTICLE V
## TERM AND TERMINATION

**Section 5.1.   Term.** This Agreement shall remain in effect through December 31, 2000 and then shall automatically renew at each succeeding year, unless terminated by either party as provided below.

**Section 5.2.   Termination.** Either party shall have the right to terminate this Agreement at any time by giving thirty (30) days written notice to the other party.

**Section 5.3.   Rights and Duties on Termination.** On termination of this Agreement:

a.   HRC shall have no further right to purchase products from HRS;

b.   HRS shall have the right to retain any sums already paid by HRC under this Agreement, and HRC shall pay all sums accrued that are then due under this Agreement; and

c.   HRC shall have no further rights whatsoever under this Agreement.

## ARTICLE VI
## MISCELLANEOUS

**Section 6.1.   Notices.** Any and all notices, elections, offers, acceptances, and demands permitted or required to be made under this Agreement shall be in writing, signed by the person giving such notice, election, offer, acceptance, or demand and shall be delivered personally, or sent by registered or certified mail, to the party, at its address on file with the other party or at such other address as may be supplied in writing. The date of personal delivery or the date of mailing, as the case may be, shall be the date of such notice, election, offer, acceptance, or demand.

**Section 6.2.   Force Majeure.** If the performance of any part of this Agreement by either party, or of any obligation under this Agreement, is prevented, restricted, interfered with, or delayed by reason of any cause beyond the reasonable control of the party liable to perform, unless conclusive evidence to the contrary is provided, the party so affected shall, on giving written notice to the other party, be excused from such performance to the extent of such prevention, restriction, interference or delay, provided that the affected party shall use its reasonable best efforts to avoid or remove such causes of nonperformance and shall continue performance with the utmost dispatch whenever such causes are removed. When such

4

circumstances arise, the parties shall discuss what, if any, modification of the terms of this Agreement may be required in order to arrive at an equitable solution.

**Section 6.3.     Successors and Assigns.** This Agreement shall be binding on and shall inure to the benefit of the parties, their respective successors, successors in title, and assigns, and each party agrees, on behalf of it, its successors, successors in title, and assigns, to execute any instruments that may be necessary or appropriate to carry out and execute the purpose and intentions of this Agreement and hereby authorizes and directs its successors, successors in title, and assigns to execute any and all such instruments. Each and every successor in interest to any party or whether such successor acquires such interest by way of gift, devise, assignment, purchase, conveyance, pledge, hypothecation, foreclosure, or by any other method, shall hold such interest subject to all of the terms and provisions of this Agreement. The rights of the parties and their successors in interest shall be governed by the terms of this Agreement, and the right of any party or successor in interest to assign, sell, or otherwise transfer or deal with its interests under this Agreement shall be subject to the limitations and restrictions of this Agreement.

**Section 6.4.     Amendment.** No change, modification, or amendment of this Agreement shall be valid or binding on the parties unless such change or modification shall be in writing signed by the party or parties against whom the same is sought to be enforced.

**Section 6.5.     Remedies Cumulative.** The remedies of the parties under this Agreement are cumulative and shall not exclude any other remedies to which the party may be lawfully entitled.

**Section 6.6.     Further Assurances.** Each party hereby covenants and agrees that it shall execute and deliver such other documents as may be required to implement any of the provisions of this Agreement.

**Section 6.7.     No Waiver.** The failure of any party to insist on strict performance of a covenant hereunder or of any obligation hereunder shall not be a waiver of such party's right to demand strict compliance therewith in the future, nor shall the same be construed as a novation of this Agreement.

**Section 6.8.     Integration.** This Agreement constitutes the full and complete agreement of the parties.

**Section 6.9.     Applicable Law.** This Agreement shall be governed by and construed in accordance with the laws of the State of Indiana.

**Section 6.10.     Severability.** In the event any provision, clause, sentence, phrase, or word hereof, or the application thereof in any circumstances, is held to be invalid or unenforceable, such invalidity or unenforceability shall not affect the validity or enforceability of the remainder hereof, or of the application of any such provision, sentence, clause, phrase, or word in any other circumstances.

**Section 6.11.     Costs and Expenses.** Unless otherwise provided in this Agreement, each party shall bear all fees and expenses incurred in performing its obligations under this Agreement.

**Section 6.12.     Confidentiality.** HRS will protect proprietary information of HRC from disclosure with the same degree of care as HRS applies in the protection of its own proprietary information of similar kind. HRC will protect proprietary information of HRS from disclosure with the same degree of care as HRC applies in the protection of its own proprietary information of similar kind. During the Term of this Agreement, and for a period of three years from the date of expiration or termination of this Agreement, HRC shall treat this Agreement, Know-How, Intellectual Property Assets, Improvements and all information, data, reports, and other records that it receives from HRS as secret, confidential, and proprietary and shall not disclose or use such information without the prior written consent of HRS except as provided in this Agreement.   HRC shall develop and implement such procedures as may be required to prevent the intentional or negligent disclosure to Third Parties of confidential information communicated to HRC and its employees by HRS. Nothing in this Agreement shall prevent the disclosure by HRC or its employees of confidential information that:

a. Prior to the transmittal thereof to HRC was of general public knowledge;

b. Becomes, subsequent to the time of transmittal to HRC, a matter of general public knowledge otherwise than as a consequence of a breach by HRC of any obligation under this Agreement;

c. Is made public by HRS;

d. Was in the possession of HRS in documentary form prior to the time of disclosure thereof to HRC by HRS, and is held by HRC free of any obligation of confidence to HRS or any third party;

e. Is received in good faith from a Third Party having the right to disclose it, who, to the best of HRC's knowledge, did not obtain such information from HRS and who imposes no obligation of secrecy on HRC with respect to such information

**Section 6.13   Intellectual Property Assets.** HRC acknowledges HRS's exclusive right, title, and interest in and to all Intellectual Property Assets. HRC shall not at any time do or cause to be done, or fail to do or cause to be done, any act or thing, directly or indirectly, contesting or in any way impairing HRS's right, title, or interest in the Intellectual Property Assets. Every use of any Intellectual Property Assets by HRC shall inure to the benefit of HRS.

**Section 6.14.   Ownership of Intellectual Property Assets.** HRC recognizes and acknowledges HRS's ownership of the Intellectual Property Assets, and agrees that nothing contained herein should be construed to establish ownership in HRC of any of the Intellectual Property Assets.

a. HRC and HRS are related companies as defined in the Trademark Act of the United States, 15 U.S.C. § 1127, and HRC's use of the trademarks included in the Intellectual Property Assets inures to the benefit of HRS for all purposes.

b. HRS shall be responsible for procurement, registration, maintenance and enforcement of all the Intellectual Property Assets. HRC shall cooperate with HRS and shall execute any documents reasonably required by HRS or supply HRS with any samples or other materials reasonably necessary to apply for, prosecute, register, maintain and enforce the Intellectual Property Assets, all at HRS's expense.

c. HRC shall not:

1. challenge HRS's ownership or the validity of the Intellectual Property Assets or any patents and registrations therefor;

2. apply for patent or registration for any of the Intellectual Property Assets in its own name; or

3. knowingly do any act that would be likely to invalidate or render unenforceable HRS's rights in the Intellectual Property Assets.

**Section 6.15.   Trademark and Tradename Quality Control.** HRC recognizes and understands the importance of HRS exercising quality control over HRC's use of the trademarks included in the Intellectual Property Assets so as to preserve the continued integrity and validity thereof, and to protect the goodwill associated therewith.

6

a.  HRS is familiar with the selling, distribution and marketing activities of HRC and approves of and adopts the standards of such quality.

b.  HRS shall exercise quality control over HRC's use of the trademarks included in the Intellectual Property Assets in connection with the selling, distribution and marketing of the products sold by HRS to a degree reasonably necessary to maintain such quality.

c.  HRC shall be responsible for, and cooperate and comply with HRS's exercise of quality control without charge.  Such cooperation and compliance shall include, but not be limited to:  (a) submitting, at HRS's written request, appropriate samples of products sold, packaging, advertising and promotional materials therefor and other items bearing the trademarks and trademarks included in the Intellectual Property Assets for HRS's inspection, review and approval, (b) allowing HRS to inspect on HRC's premises the products sold by HRS, packaging, advertising and promotional materials therefor and other items bearing the trademarks and tradenames included in the Intellectual Property Assets, (c) allowing HRS to inspect HRC's premises and operations to ensure that all uses of the trademarks and tradenames included in the Intellectual Property Assets are permissible uses thereof, (d) allowing HRS to review records relating to customer and other claims or complaints, and (e) submitting to audits or other reviews of its compliance with HRS's quality control specifications and standards, as amended from time to time by HRS.

d.  HRC shall use their best efforts to ensure that the products sold by HRS, and packaging, advertising and promotional materials therefor and other items, bearing the trademarks and tradenames included in the Intellectual Property Assets, comply with all applicable ordinances, laws, and statutes governing the manufacturing of such products.

**Section 6.16.    Know-How.**  During the term of this Agreement, HRS shall disclose to HRC as much of its Know-How as HRC reasonably needs sell, distribute and market products supplied by HRS.

**Section 6.17.    Intellectual Property Assets Enforcement**  In the event that HRC learns of any infringement or unauthorized use of any of the Intellectual Property Assets, it shall promptly notify HRS. HRS has the right to send infringement notices and bring actions relating to the Intellectual Property Assets at its own expense.  If requested to do so, HRC shall cooperate with and assist HRS in any such action, including joining the action as a party, if necessary, at HRS's expense.  Any award, or portion of an award, recovered by HRS in any such action or proceeding commenced by HRS shall belong solely to HRS after recovery by both parties of their respective actual out-of-pocket costs.

HRS and HRC shall keep one another informed of the status of, and their respective activities regarding, any litigation concerning the Intellectual Property Assets.  HRS and HRC may not enter into a settlement or consent judgement involving the Intellectual Property Assets unless they obtain the other party's prior written consent.

**Section 6.18.    Indemnity** HRC shall indemnify and hold harmless HRS and its affiliated entities and their respective officers, employees, and agents, from any and all claims, suits, damages, attorney's fees, costs, and expenses arising from HRC's selling, distributing and marketing products sold by HRS under this Agreement, whenever and however asserted and established.

HRS shall indemnify and hold harmless HRS and its affiliated entities and their respective officers, employees, and agents, from any and all claims, suits, damages, attorney's fees, costs, and expenses arising from actions challenging HRS's ownership of the Intellectual Property Assets and HRC's rights thereunder pursuant to this Agreement.

Section 6.19.   **Improvements.**  During the term of this Agreement, each party shall promptly inform the other party of any information that it obtains or develops regarding Improvements

Section 6.20.   **Headings.**  The headings used in this Agreement are for convenience of reference only and do not constitute a part of this Agreement for any other purpose and shall not have any force or effect in the construction of this Agreement.

IN WITNESS WHEREOF, the parties have caused this Agreement to be executed on the date first written above by their authorized officers.

Hill-Rom Services, Inc.

By:_____
        President

Hill-Rom Services, Inc.,
  a Delaware corporation


By:_____


Hill-Rom Company, Inc.

By:_____
        Secretary


Hill-Rom Company, Inc.,
  an Indiana corporation


By:_____

# Exhibit B

## PRODUCT SUPPLY AGREEMENT

THIS AGREEMENT is entered into effective March 26, 2000, (the "Effective Date"), by and between Hill-Rom Services, Inc. a Delaware corporation ("HRS") and Hill-Rom Inc., an Indiana corporation ("HRI").

### RECITALS

WHEREAS, HRI is a leading manufacturer of hospital equipment and other related products;

WHEREAS, HRS desires to have HRI produce items for the purpose of resale;

WHEREAS, HRI desires to sell products manufactured by HRI to HRS;

WHEREAS, HRS desires to provide certain services to HRI and HRI desires to provide certain services to HRS;

WHEREAS, HRS is the owner of certain patents, tradenames, trademarks, copyrights and know-how ("Intellectual Property Assets") related to the products manufactured by HRI, and HRI desires to obtain, and HRS is willing to grant, the herein-contained non-exclusive, worldwide rights under the Intellectual Property Assets to make, have made and source the products manufactured by HRI and supply them to HRS in accordance with the terms and conditions of this Product Supply Agreement; and,

NOW, THEREFORE, in consideration of the mutual covenants and conditions contained herein and intending to be legally bound, the parties hereby agree as follows:

### ARTICLE I
### MANUFACTURING AND PURCHASING RELATIONSHIP

**Section 1.1.**       *Nature of Relationship.* The relationship established between HRI and HRS by this Agreement is that of a contract manufacturer and purchaser. Under this agreement, HRS shall not have the right to assume or create any obligation of any kind, either express or implied, on behalf of HRI, except as expressly provided for in this Agreement.

### ARTICLE II
### RESPONSIBILITIES

**Section 2.1.**       *Of HRS.* HRS shall at all times during the term of this Agreement:

    a.    Assume all market risk relating to the goods and products, where market risk refers to the risk that the goods and products will not sell in the market;

    b.    Purchase all products manufactured by HRI pursuant to its purchase order requests.

    c.    Acquire and hold title to all Intellectual Property Assets, know-how and improvements developed by HRI as part of the purchase price paid by HRS for products manufactured by HRI.

    d.    Provide to HRI full information with respect to product specifications and changes for products to be manufactured by HRI.

    e.    Provide full information to HRI related to the amount of and type of product to be manufactured by HRI in a timely manner.

    f.    Provide HRI with a 12-month forecast of its need for Product, stated in calendar quarter increments, which shall be in writing and delivered to HRI no later than 30 days before the beginning of each Year during the Term of this Agreement (the "Annual Product Requirements Amount").

g.   Provide HRI with notice of its expected need for Product during the next calendar quarter, which notice shall be in writing and delivered to HRI no later than 30 days before the beginning of each calendar quarter during the Term of this Agreement.

h.   Provide HRI with notice of its actual requirements for Product during the next calendar quarter, which notice shall be in writing and delivered to HRI no later than 15 days before the beginning of each calendar quarter during the Term of this Agreement.

i.   Provide HRI non-exclusive worldwide rights to use and to disclose to others the know-how, including the copyrights, included in the Intellectual Property Assets in connection with the manufacturing, having manufactured and sourcing of the products manufactured by HRI in accordance with the terms and conditions of this Product Supply Agreement; provided, however, that such use and disclosure are consistent with HRI confidentiality obligations set forth in Section 6.12. hereof.

j.   HRS hereby represents and warrants to HRI that HRS has means, capacity and wherewithal to procure, register, maintain and enforce the Intellectual Property Assets, and to exercise adequate quality control over HRI's use of the Intellectual Property Assets to a degree reasonably necessary to ensure the continued validity and enforceability of the Intellectual Property Assets, and the goodwill associated herewith.

k.   Anything in this Agreement to the contrary notwithstanding, HRS does not present or warrant to HRI that the products manufactured by HRI are free from infringement of the intellectual property rights of third parties.

l.   Provide to HRI the services, to the extent requested in the Corporate Services Agreement, dated March 26, 2000, between HRI and HRS.

**Section 2.2.**          **Of HRI.** HRI shall at all times during the terms of this Agreement:

a.   Assume no market risk, where market risk refers to the risk that the goods and products will not sell in the market;

b.   Assume responsibility for all costs and risks related to products manufactured by HRI not expressly assumed by HRS under this agreement, including buy not limited to manufacturing costs.

c.   HRI shall use such Intellectual Property Asset notices and/or markings in the conduct of its business in connection with the manufacturing, having manufactured and sourcing of the products manufactured by HRI as are deemed advisable by HRS.

d.   Provide to HRS the services, to the extent requested in the Corporate Services Agreement, dated March 26, 2000, between HRS and HRI.

## ARTICLE III
## TERMS OF SALE OF HRI PRODUCTS

**Section 3.1.**          **Sale of Products.** HRS shall order from HRI, and HRI shall supply, such products manufactured by HRI, as HRS shall desire pursuant to such procedures as HRI shall periodically specify.

**Section 3.2.**          **Pricing.** HRS shall purchase such products manufactured by HRI at such prices as mutually agreed to by both parties. Such prices shall include compensation for any and all services rendered between the parties as outlined within any Article within this Agreement.

**Section 3.3.**        **Shipment Confirmation.** HRI shall advise HRS of all shipments of products manufactured by HRI in a timely manner, giving the description, quantity, purchase order number, delivery destination and other pertinent information.

**Section 3.4.**        **Payment Terms.** HRS shall pay all HRI charges no later than 60 days from the date of shipment of the products manufactured by HRI to the ultimate consumers. All HRI charges shall be paid in full without any deductions or credits of any kind. Any requests for credit or deduction by HRS (e.g., due to shortage in shipment quantity, quality defects, damage in transit, or related matters), shall be processed in the form of a separate charge to HRI.

**Section 3.5.**        **Delivery, Title, Risk of Loss, Expenses.** The parties agree that title to all products manufactured by HRI shall shift to HRS at HRI's manufacturing facilities. All risk of loss to the product shall shift to HRS at the manufacturing facilities. The arrangement for and all freight, transportation, customs, duties, and other costs of transporting products manufactured by HRI and purchased by HRS will not be the responsibility of HRI.

**ARTICLE IV**
**WARRANTIES AND REPRESENTATIONS**

**Section 4.1.**        **HRI Warranties.** HRI warrants that:

    a.  It has the right to transfer full unencumbered title to all products manufactured by HRI and sold to HRS under the terms of this Agreement;

    b.  It has the right and authority to enter into this Agreement.

    c.  It has the capacity to fulfill HRS's expected requirements for Product;

**Section 4.2.**        **HRS Warranties.** HRS warrants that:

    a.  It has the right and authority to enter into this Agreement; and

    b.  Will advise HRI of any claim for damages or breach of warranty with respect to products manufactured by HRI and asserted by it or a customer purchasing products manufactured by HRI.

**ARTICLE V**
**TERM AND TERMINATION**

**Section 5.1.**    **Term.** This Agreement shall remain in effect through December 31, 2000 and then shall automatically renew at the end of each succeeding year, unless terminated by either party as provided below.

**Section 5.2.**    **Termination.** Either party shall have the right to terminate this Agreement at any time by giving thirty (30) days written notice to the other party.

**Section 5.3.**    **Rights and Duties on Termination.** On termination of this Agreement:

    a.  HRS shall have no further right to purchase products manufactured by HRI;

    b.  HRI shall have the right to retain any sums already paid by HRS under this Agreement, and HRS shall pay all sums accrued that are then due under this Agreement; and

    c.  HRS shall have no further rights whatsoever under this Agreement.

3

## ARTICLE VI
## MISCELLANEOUS

**Section 6.1.**     **Notices.** Any and all notices, elections, offers, acceptances, and demands permitted or required to be made under this Agreement shall be in writing, signed by the person giving such notice, election, offer, acceptance, or demand and shall be delivered personally, or sent by registered or certified mail, to the party, at its address on file with the other party or at such other address as may be supplied in writing. The date of personal delivery or the date of mailing, as the case may be, shall be the date of such notice, election, offer, acceptance, or demand.

**Section 6.2.**     **Force Majeure.** If the performance of any part of this Agreement by either party, or of any obligation under this Agreement, is prevented, restricted, interfered with, or delayed by reason of any cause beyond the reasonable control of the party liable to perform, unless conclusive evidence to the contrary is provided, the party so affected shall, on giving written notice to the other party, be excused from such performance to the extent of such prevention, restriction, interference or delay, provided that the affected party shall use its reasonable best efforts to avoid or remove such causes of nonperformance and shall continue performance with the utmost dispatch whenever such causes are removed. When such circumstances arise, the parties shall discuss what, if any, modification of the terms of this Agreement may be required in order to arrive at an equitable solution.

**Section 6.3.**     **Successors and Assigns.** This Agreement shall be binding on and shall inure to the benefit of the parties, their respective successors, successors in title, and assigns, and each party agrees, on behalf of it, its successors, successors in title, and assigns, to execute any instruments that may be necessary or appropriate to carry out and execute the purpose and intentions of this Agreement and hereby authorizes and directs its successors, successors in title, and assigns to execute any and all such instruments. Each and every successor in interest to any party or whether such successor acquires such interest by way of gift, devise, assignment, purchase, conveyance, pledge, hypothecation, foreclosure, or by any other method, shall hold such interest subject to all of the terms and provisions of this Agreement. The rights of the parties and their successors in interest shall be governed by the terms of this Agreement, and the right of any party or successor in interest to assign, sell, or otherwise transfer or deal with its interests under this Agreement shall be subject to the limitations and restrictions of this Agreement.

**Section 6.4.**     **Amendment.** No change, modification, or amendment of this Agreement shall be valid or binding on the parties unless such change or modification shall be in writing signed by the party or parties against whom the same is sought to be enforced.

**Section 6.5**     **Remedies Cumulative.** The remedies of the parties under this Agreement are cumulative and shall not exclude any other remedies to which the party may be lawfully entitled.

**Section 6.6**     **Further Assurances.** Each party hereby covenants and agrees that it shall execute and deliver such other documents as may be required to implement any of the provisions of this Agreement.

**Section 6.7.**     **No Waiver.** The failure of any party to insist on strict performance of a covenant hereunder or of any obligation hereunder shall not be a waiver of such party's right to demand strict compliance therewith in the future, nor shall the same be construed as a novation of this Agreement.

**Section 6.8.**     **Integration.** This Agreement constitutes the full and complete agreement of the parties.

**Section 6.9.**     **Applicable Law.** This Agreement shall be governed by and construed in accordance with the laws of the State of Indiana.

**Section 6.10.**     **Severability.** In the event any provision, clause, sentence, phrase, or word hereof, or the application thereof in any circumstances, is held to be invalid or unenforceable, such invalidity or unenforceability shall not affect the validity or enforceability of the remainder hereof, or of the application of any such provision, sentence, clause, phrase, or word in any other circumstances.

**Section 6.11.**     **Costs and Expenses.** Unless otherwise provided in this Agreement, each party shall bear all fees and expenses incurred in performing its obligations under this Agreement.

4

**Section 6.12.     Confidentiality.** HRS will protect proprietary information of HRI from disclosure with the same degree of care as HRS applies in the protection of its own proprietary information of similar kind. HRI will protect proprietary information of HRS from disclosure with the same degree of care as HRI applies in the protection of its own proprietary information of similar kind.  During the Term of this Agreement, and for a period of three years from the date of expiration or termination of this Agreement, HRI shall treat this Agreement, Know-How, Intellectual Property Assets, Improvements and all information, data, reports, and other records that it receives from HRS as secret, confidential, and proprietary and shall not disclose or use such information without the prior written consent of HRS except as provided in this Agreement.  HRI shall develop and implement such procedures as may be required to prevent the intentional or negligent disclosure to Third Parties of confidential information communicated to HRI and its employees by HRS.  Nothing in this Agreement shall prevent the disclosure by HRI or its employees of confidential information that:

    a.   Prior to the transmittal thereof to HRI was of general public knowledge;

    b.   Becomes, subsequent to the time of transmittal to HRI, a matter of general public knowledge otherwise than as a consequence of a breach by HRI of any obligation under this Agreement;

    c.   Is made public by HRS;

    d.   Was in the possession of HRS in documentary form prior to the time of disclosure thereof to HRI by HRS, and is held by HRI free of any obligation of confidence to HRS or any third party;

    e.   Is received in good faith from a Third Party having the right to disclose it, who, to the best of HRI's knowledge, did not obtain such information from HRS and who imposes no obligation of secrecy of HRI with respect to such information from HRS and who imposes no obligation of secrecy on HRI with respect to such information.

**Section 6.13.     Intangible Property Asset Ownership.** HRI acknowledges HRS's exclusive right, title, and interest in and to the Intellectual Property Assets.  HRI shall not at any time do or cause to be done, or fail to do or cause to be done, any act or thing, directly or indirectly, contesting or in any way impairing HRS's right, title, or interest in the Intellectual Property Assets.  Every use of any Intellectual Property Assets by HRI shall inure to the benefit of HRS.

**Section 6.14.     Ownership of Intellectual Property Assets.** HRI recognizes and acknowledges HRS's ownership of the Intellectual Property Assets, and agrees that nothing contained herein should be construed to establish ownership in HRI of any of the Intellectual Property Assets.

    a.   HRI and HRS are related companies as defined in the Trademark Act of the United States, 15 U.S.C. § 1127, and HRI's use of the trademarks included in the Intellectual Property Assets inures to the benefit of HRS for all purposes.

    b.   HRS shall be responsible for procurement, registration, maintenance, and enforcement of all the Intellectual Property Assets.  HRI shall cooperate with HRS and shall execute any documents reasonably required by HRS or supply HRS with any samples or other materials reasonable necessary to apply for, prosecute, register, maintain and enforce the Intellectual Property Assets, all at HRS's expense.

    c.   HRI shall not:

        1.   challenge HRS's ownership or the validity of the Intellectual Property Assets or any patents and registrations therefor:

        2.   apply for patent or registration for any of the Intellectual Property Assets in its own name, or

3.   knowingly do any act that would be likely to invalidate or render unenforceable HRS's rights in the Intellectual Property Assets.

**Section 6.16.   Trademark and Tradename Quality Control.** HRI recognizes and understands the importance of HRS exercising quality control over HRI's use of the trademarks included in the Intellectual Property Assets so as to preserve the continued integrity and validity thereof, and to protect the goodwill associated therewith.

a.   HRS is familiar with the quality of the products heretofore manufactured by HRI and approves of and adopts the standards of such quality.

b.   HRS shall exercise quality control over HRI's use of the trademarks included in the Intellectual Property Assets in connection with the manufacturing, having manufactured and sourcing of the products manufactured by HRI to a degree reasonably necessary to maintain such quality.

c.   HRI shall use the trademarks included in the Intellectual Property Assets on or in connection only with those products manufactured by HRI that conform to the specifications and standards of quality prescribed by HRS and necessary to maintain such quality, as amended from time to time by HRS, and will not depart from said specifications and standards without written permission from HRS.

d.   HRI shall be responsible for, and cooperate and comply with HRS's exercise of quality control without charge. Such cooperation and compliance shall include, but not be limited to: (a) submitting, at HRS's written request, appropriate samples of products manufactured by HRI, packaging, advertising and promotional materials therefor and other items bearing the trademarks included in the Intellectual Property Assets for HRS's inspections, review and approval, (b) allowing HRS to inspect on HRI's premises the products manufactured by HRI, packaging, advertising and promotional materials therefor and other items bearing the trademarks included in the Intellectual Property Assets, (c) allowing HRS to inspect HRI's premises and operations to ensure that all uses of the trademarks included in the Intellectual Property Assets are permissible uses thereof, (d) allowing HRS to review records relating to customer and other claims or complaints, and (e) submitting to audits or other review of its compliance with HRS's quality control specifications and standards, as amended from time to time by HRS.

e.   HRI shall use their best efforts to ensure that the products manufactured by HRI, and packaging, advertising and promotional materials therefor and other items, bearing the trademarks included in the Intellectual Property Assets, comply with all applicable ordinances, laws, and statutes governing the manufacturing of such products.

**Section 6.17.   Know-How.** During the term of this Agreement, HRS shall disclose to HRI as much of its Know-How as HRI reasonably needs to manufacture Product.

**Section 6.18.   Intellectual Property Asset Enforcement.** In the event that HRI learns of any infringement or unauthorized use of any of the Intellectual Property Assets, it shall promptly notify HRS. HRS has the right to send infringement notices and bring actions relating to the Intellectual Property Assets at its own expense. If requested to do so, HRI shall cooperate with and assist HRS in any such action, including joining the action as a party, if necessary, at HRS's expense. Any award, or portion of an award, recovered by HRS in any such action or proceeding commenced by HRS shall belong solely to HRS after recovery by both parties of their respective actual out-of-pocket costs.

HRS and HRI shall keep one another informed of the status of, and their respective activities regarding, any litigation concerning the Intellectual Property Assets. HRS and HRI may not enter into a settlement or consent judgement involving the Intellectual Property Assets unless they obtain the other party's prior written consent.

6

Section 6.19.    **Indemnity.** HRI shall indemnify and hold harmless HRS and its affiliated entities and their respective officers, employees, and agents, from any and all claims, suits, damages, attorney's fees, costs, and expenses arising from HRI's manufacturing, having manufactured and sourcing of the products manufactured by HRI under this Agreement, whenever and however asserted and established.

HRS shall indemnify and hold harmless HRI and its affiliated entities and their respective officers, employees, and agents, from any and all claims, suits, damages, attorney's fees, costs, and expenses arising from actions challenging HRS's ownership of the Intellectual Property Assets and HRI's rights thereunder pursuant to this Agreement.

Section 6.19.    **Improvements.** During the term of this Agreement, each party shall promptly inform the other party of any information that it obtains or develops regarding Improvements.

Section 6.20.    **Headings.** The headings used in this Agreement are for convenience of reference only and do not constitute a part of this Agreement for any other purpose and shall not have any force or effect in the construction of this Agreement.

Section 6.21.    **Attorney's Fee.** The prevailing party in any action between the parties which is based on this Agreement or any document related hereto shall have its reasonable attorney's fees and other costs incurred in such action or proceeding including any incurred for pre-suit, trial, arbitration, post-judgement and appeal, paid by the other party.

Section 6.22.    **Miscellaneous.**

   a.   This Agreement contains the entire understanding between the parties and supersedes all other agreements between the parties pertaining to the Intellectual Property Assets.

   b.   This Agreement shall not be deemed a franchise agreement for purposes of any state franchise disclosure law or the F.T.C. Rules.

        IN WITNESS WHEREOF, the parties have caused this Agreement to be executed on the date first written above by their authorized officers.

Hill-Rom, Inc.                                      Hill-Rom Services, Inc.

By:_____                          By:_____
Hill-Rom, Inc.                                      Hill-Rom Services, Inc.
and Indiana corporation                             a Delaware corporation


By:_____                          By:_____

## PRODUCT SUPPLY AGREEMENT

THIS AGREEMENT is entered into effective March 26, 2000, (the "Effective Date"), by and between Hill-Rom Services, Inc. a Delaware corporation ("HRS") and Hill-Rom Air-Shields, Inc., a Delaware corporation ("HRA").

## RECITALS

WHEREAS, HRA is a leading manufacturer of hospital equipment and other related products;

WHEREAS, HRS desires to have HRA produce items for the purpose of resale;

WHEREAS, HRA desires to sell products manufactured by HRA to HRS;

WHEREAS, HRS desires to provide certain services to HRA and HRA desires to provide certain services to HRS; and,

WHEREAS, HRS is the owner of certain patents, tradenames, trademarks, copyrights and know-how ("Intellectual Property Assets") related to the products manufactured by HRA, and HRA desires to obtain, and HRS is willing to grant, the herein-contained non-exclusive, worldwide rights under the Intellectual Property Assets to make, have made and source the products manufactured by HRA and supply them to HRS in accordance with the terms and conditions of this Product Supply Agreement.

NOW, THEREFORE, in consideration of the mutual covenants and conditions contained herein and intending to be legally bound, the parties hereby agree as follows:

### ARTICLE I
### MANUFACTURING AND PURCHASING RELATIONSHIP

**Section 1.1.** **Nature of Relationship.** The relationship established between HRA and HRS by this Agreement is that of a contract manufacturer and purchaser. Under this agreement, HRS shall not have the right to assume or create any obligation of any kind, either express or implied, on behalf of HRA, except as expressly provided for in this Agreement.

### ARTICLE II
### RESPONSIBILITIES

**Section 2.1.** **Of HRS.** HRS shall at all times during the term of this Agreement:

    a.    Assume all market risk relating to the goods and products, where market risk refers to the risk that the goods and products will not sell in the market;

    b.    Purchase all products manufactured by HRA pursuant to its purchase order requests.

    c.    Acquire and hold title to all Intellectual Property Assets, know-how and improvements developed by HRA as part of the purchase price paid by HRS for products manufactured by HRA.

    d.    Provide to HRA full information with respect to product specifications and changes for products to be manufactured by HRA.

    e.    Provide full information to HRA related to the amount of and type of product to be manufactured by HRA in a timely manner.

    f.    Provide HRA with a 12-month forecast of its need for Product, stated in calendar quarter increments, which shall be in writing and delivered to HRA no later than 30 days before the beginning of each Year during the Term of this Agreement (the "Annual Product Requirements Amount").

1

g.   Provide HRA with notice of its expected need for Product during the next calendar quarter, which notice shall be in writing and delivered to HRA no later than 30 days before the beginning of each calendar quarter during the Term of this Agreement.

h.   Provide HRA with notice of its actual requirements for Product during the next calendar quarter, which notice shall be in writing and delivered to HRA no later than 15 days before the beginning of each calendar quarter during the Term of this Agreement.

i.   Provide HRA non-exclusive worldwide rights to use and to disclose to others the know-how, including the copyrights, included in the Intellectual Property Assets in connection with the manufacturing, having manufactured and sourcing of the products manufactured by HRA in accordance with the terms and conditions of this Product Supply Agreement; provided, however, that such use and disclosure are consistent with HRA confidentiality obligations set forth in Section 6.12. hereof.

j.   HRS hereby represents and warrants to HRA that HRS has means, capacity and wherewithal to procure, register, maintain and enforce the Intellectual Property Assets, and to exercise adequate quality control over HRA's use of the Intellectual Property Assets to a degree reasonably necessary to ensure the continued validity and enforceability of the Intellectual Property Assets, and the goodwill associated herewith.

k.   Anything in this Agreement to the contrary notwithstanding, HRS does not present or warrant to HRA that the products manufactured by HRA are free from infringement of the intellectual property rights of third parties.

l.   Provide to HRA the services, to the extent requested in the Corporate Services Agreement, dated March 26, 2000, between HRA and HRS.

**Section 2.2.**        **Of HRA.**  HRA shall at all times during the terms of this Agreement:

a.   Assume no market risk, where market risk refers to the risk that the goods and products will not sell in the market;

b.   Assume responsibility for all costs and risks related to products manufactured by HRA not expressly assumed by HRS under this agreement, including buy not limited to manufacturing costs.

c.   HRA shall use such Intellectual Property Asset notices and/or markings in the conduct of its business in connection with the manufacturing, having manufactured and sourcing of the products manufactured by HRA as are deemed advisable by HRS.

d.   Provide to HRS the services, to the extent requested in the Corporate Services Agreement, dated March 26, 2000, between HRS and HRA.

**ARTICLE III**
**TERMS OF SALE OF HRA PRODUCTS**

**Section 3.1.**        **Sale of Products.**  HRS shall order from HRA, and HRA shall supply, such products manufactured by HRA, as HRS shall desire pursuant to such procedures as HRA shall periodically specify.

**Section 3.2.**        **Pricing.**  HRS shall purchase products manufactured by HRA at such prices as mutually agreed to by both parties.   Such prices shall include compensation for any and all services rendered between the parties as outlined within any Article within this Agreement.

2

**Section 3.3.**         **Shipment Confirmation.** HRA shall advise HRS of all shipments of products manufactured by HRA in a timely manner, giving the description, quantity, purchase order number, delivery destination and other pertinent information.

**Section 3.4.**         **Payment Terms.** HRS shall pay all HRA charges no later than 60 days from the date of shipment of the products manufactured by HRA to the ultimate consumers. All HRA charges shall be paid in full without any deductions or credits of any kind. Any requests for credit or deduction by HRS (e.g., due to shortage in shipment quantity, quality defects, damage in transit, or related matters), shall be processed in the form of a separate charge to HRA.

**Section 3.5.**         **Delivery, Title, Risk of Loss, Expenses.** The parties agree that title to all products manufactured by HRA shall shift to HRS at HRA's manufacturing facilities. All risk of loss to the product shall shift to HRS at the manufacturing facilities. The arrangement for and all freight, transportation, customs, duties, and other costs of transporting products manufactured by HRA and purchased by HRS will not be the responsibility of HRA.

## ARTICLE IV
## WARRANTIES AND REPRESENTATIONS

**Section 4.1.**         **HRA Warranties.** HRA warrants that:

    a.   It has the right to transfer full unencumbered title to all products manufactured by HRA and sold to HRS under the terms of this Agreement;

    b.   It has the right and authority to enter into this Agreement.

    c.   It has the capacity to fulfill HRS's expected requirements for Product;

**Section 4.2.**         **HRS Warranties.** HRS warrants that:

    a.   It has the right and authority to enter into this Agreement; and

    b.   Will advise HRA of any claim for damages or breach of warranty with respect to products manufactured by HRA and asserted by it or a customer purchasing products manufactured by HRA.

## ARTICLE V
## TERM AND TERMINATION

**Section 5.1.**    **Term.** This Agreement shall remain in effect through December 31, 2000 and then shall automatically renew each succeeding year, unless terminated by either party as provided below.

**Section 5.2.**    **Termination.** Either party shall have the right to terminate this Agreement at any time by giving thirty (30) days written notice to the other party.

**Section 5.3.**    **Rights and Duties on Termination.** On termination of this Agreement:

    a.   HRS shall have no further right to purchase products manufactured by HRA;

    b.   HRA shall have the right to retain any sums already paid by HRS under this Agreement, and HRS shall pay all sums accrued that are then due under this Agreement; and

    c.   HRS shall have no further rights whatsoever under this Agreement.

# ARTICLE VI
## MISCELLANEOUS

**Section 6.1.      Notices.** Any and all notices, elections, offers, acceptances, and demands permitted or required to be made under this Agreement shall be in writing, signed by the person giving such notice, election, offer, acceptance, or demand and shall be delivered personally, or sent by registered or certified mail, to the party, at its address on file with the other party or at such other address as may be supplied in writing. The date of personal delivery or the date of mailing, as the case may be, shall be the date of such notice, election, offer, acceptance, or demand.

**Section 6.2.      Force Majeure.** If the performance of any part of this Agreement by either party, or of any obligation under this Agreement, is prevented, restricted, interfered with, or delayed by reason of any cause beyond the reasonable control of the party liable to perform, unless conclusive evidence to the contrary is provided, the party so affected shall, on giving written notice to the other party, be excused from such performance to the extent of such prevention, restriction, interference or delay, provided that the affected party shall use its reasonable best efforts to avoid or remove such causes of nonperformance and shall continue performance with the utmost dispatch whenever such causes are removed. When such circumstances arise, the parties shall discuss what, if any, modification of the terms of this Agreement may be required in order to arrive at an equitable solution.

**Section 6.3.      Successors and Assigns.** This Agreement shall be binding on and shall inure to the benefit of the parties, their respective successors, successors in title, and assigns, and each party agrees, on behalf of it, its successors, successors in title, and assigns, to execute any instruments that may be necessary or appropriate to carry out and execute the purpose and intentions of this Agreement and hereby authorizes and directs its successors, successors in title, and assigns to execute any and all such instruments. Each and every successor in interest to any party or whether such successor acquires such interest by way of gift, devise, assignment, purchase, conveyance, pledge, hypothecation, foreclosure, or by any other method, shall hold such interest subject to all of the terms and provisions of this Agreement. The rights of the parties and their successors in interest shall be governed by the terms of this Agreement, and the right of any party or successor in interest to assign, sell, or otherwise transfer or deal with its interests under this Agreement shall be subject to the limitations and restrictions of this Agreement.

**Section 6.4.      Amendment.** No change, modification, or amendment of this Agreement shall be valid or binding on the parties unless such change or modification shall be in writing signed by the party or parties against whom the same is sought to be enforced.

**Section 6.5      Remedies Cumulative.** The remedies of the parties under this Agreement are cumulative and shall not exclude any other remedies to which the party may be lawfully entitled.

**Section 6.6      Further Assurances.** Each party hereby covenants and agrees that it shall execute and deliver such other documents as may be required to implement any of the provisions of this Agreement.

**Section 6.7.      No Waiver.** The failure of any party to insist on strict performance of a covenant hereunder or of any obligation hereunder shall not be a waiver of such party's right to demand strict compliance therewith in the future, nor shall the same be construed as a novation of this Agreement.

**Section 6.8.      Integration.** This Agreement constitutes the full and complete agreement of the parties.

**Section 6.9.      Applicable Law.** This Agreement shall be governed by and construed in accordance with the laws of the State of Indiana.

**Section 6.10.      Severability.** In the event any provision, clause, sentence, phrase, or word hereof, or the application thereof in any circumstances, is held to be invalid or unenforceable, such invalidity or unenforceability shall not affect the validity or enforceability of the remainder hereof, or of the application of any such provision, sentence, clause, phrase, or word in any other circumstances.

**Section 6.11.      Costs and Expenses.** Unless otherwise provided in this Agreement, each party shall bear all fees and expenses incurred in performing its obligations under this Agreement.

4

**Section 6.12.     Confidentiality.** HRS will protect proprietary information of HRA from disclosure with the same degree of care as HRS applies in the protection of its own proprietary information of similar kind. HRA will protect proprietary information of HRS from disclosure with the same degree of care as HRA applies in the protection of its own proprietary information of similar kind. During the Term of this Agreement, and for a period of three years from the date of expiration or termination of this Agreement, HRA shall treat this Agreement, Know-How, Intellectual Property Assets, Improvements and all information, data, reports, and other records that it receives from HRS as secret, confidential, and proprietary and shall not disclose or use such information without the prior written consent of HRS except as provided in this Agreement. HRA shall develop and implement such procedures as may be required to prevent the intentional or negligent disclosure to Third Parties of confidential information communicated to HRA and its employees by HRS. Nothing in this Agreement shall prevent the disclosure by HRA or its employees of confidential information that:

    a.   Prior to the transmittal thereof to HRA was of general public knowledge;

    b.   Becomes, subsequent to the time of transmittal to HRA, a matter of general public knowledge otherwise than as a consequence of a breach by HRA of any obligation under this Agreement;

    c.   Is made public by HRS;

    d.   Was in the possession of HRS in documentary form prior to the time of disclosure thereof to HRA by HRS, and is held by HRA free of any obligation of confidence to HRS or any third party;

    e.   Is received in good faith from a Third Party having the right to disclose it, who, to the best of HRA's knowledge, did not obtain such information from HRS and who imposes no obligation of secrecy of HRA with respect to such information from HRS and who imposes no obligation of secrecy on HRA with respect to such information.

**Section 6.13.     Intellectual Property Asset Ownership.** HRA acknowledges HRS's exclusive right, title, and interest in and to the Intellectual Property Assets. HRA shall not at any time do or cause to be done, or fail to do or cause to be done, any act or thing, directly or indirectly, contesting or in any way impairing HRS's right, title, or interest in the Intellectual Property Assets. Every use of any Intellectual Property Assets by HRA shall inure to the benefit of HRS.

**Section 6.14.     Ownership of Intellectual Property Assets.** HRA recognizes and acknowledges HRS's ownership of the Intellectual Property Assets, and agrees that nothing contained herein should be construed to establish ownership in HRA of any of the Intellectual Property Assets.

    a.   HRA and HRS are related companies as defined in the Trademark Act of the United States, 15 U.S.C. § 1127, and HRA's use of the trademarks included in the Intellectual Property Assets inures to the benefit of HRS for all purposes.

    b.   HRS shall be responsible for procurement, registration, maintenance, and enforcement of all the Intellectual Property Assets. HRA shall cooperate with HRS and shall execute any documents reasonably required by HRS or supply HRS with any samples or other materials reasonable necessary to apply for, prosecute, register, maintain and enforce the Intellectual Property Assets, all at HRS's expense.

    c.   HRA shall not:

        1.   challenge HRS's ownership or the validity of the Intellectual Property Assets or any patents and registrations therefor:

        2.   apply for patent or registration for any of the Intellectual Property Assets in its own name, or

5

3.  knowingly do any act that would be likely to invalidate or render unenforceable HRS's rights in the Intellectual Property Assets.

**Section 6.16.     Trademark and Tradename Quality Control.**  HRA recognizes and understands the importance of HRS exercising quality control over HRA's use of the trademarks included in the Intellectual Property Assets so as to preserve the continued integrity and validity thereof, and to protect the goodwill associated therewith.

a.  HRS is familiar with the quality of the products heretofore manufactured by HRA and approves of and adopts the standards of such quality.

b.  HRS shall exercise quality control over HRA's use of the trademarks included in the Intellectual Property Assets in connection with the manufacturing, having manufactured and sourcing of the products manufactured by HRA to a degree reasonably necessary to maintain such quality.

c.  HRA shall use the trademarks included in the Intellectual Property Assets on or in connection only with those products manufactured by HRA that conform to the specifications and standards of quality prescribed by HRS and necessary to maintain such quality, as amended from time to time by HRS, and will not depart from said specifications and standards without written permission from HRS.

d.  HRA shall be responsible for, and cooperate and comply with HRS's exercise of quality control without charge.  Such cooperation and compliance shall include, but not be limited to: (a) submitting, at HRS's written request, appropriate samples of products manufactured by HRA, packaging, advertising and promotional materials therefor and other items bearing the trademarks included in the Intellectual Property Assets for HRS's inspections, review and approval, (b) allowing HRS to inspect on HRA's premises the products manufactured by HRA, packaging, advertising and promotional materials therefor and other items bearing the trademarks included in the Intellectual Property Assets, (c) allowing HRS to inspect HRA's premises and operations to ensure that all uses of the trademarks included in the Intellectual Property Assets are permissible uses thereof, (d) allowing HRS to review records relating to customer and other claims or complaints, and (e) submitting to audits or other review of its compliance with HRS's quality control specifications and standards, as amended from time to time by HRS.

e.  HRA shall use their best efforts to ensure that the products manufactured by HRA, and packaging, advertising and promotional materials therefor and other items, bearing the trademarks included in the Intellectual Property Assets, comply with all applicable ordinances, laws, and statutes governing the manufacturing of such products.

**Section 6.17.     Know-How.**  During the term of this Agreement, HRS shall disclose to HRA as much of its Know-How as HRA reasonably needs to manufacture Product.

**Section 6.18.     Intellectual Property Asset Enforcement.**  In the event that HRA learns of any infringement or unauthorized use of any of the Intellectual Property Assets, it shall promptly notify HRS. HRS has the right to send infringement notices and bring actions relating to the Intellectual Property Assets at its own expense.  If requested to do so, HRA shall cooperate with and assist HRS in any such action, including joining the action as a party, if necessary, at HRS's expense.  Any award, or portion of an award, recovered by HRS in any such action or proceeding commenced by HRS shall belong solely to HRS after recovery by both parties of their respective actual out-of-pocket costs.

HRS and HRA shall keep one another informed of the status of, and their respective activities regarding, any litigation concerning the Intellectual Property Assets.  HRS and HRA may not enter into a settlement or consent judgement involving the Intellectual Property Assets unless they obtain the other party's prior written consent.

6

**Section 6.19.     Indemnity.** HRA shall indemnify and hold harmless HRS and its affiliated entities and their respective officers, employees, and agents, from any and all claims, suits, damages, attorney's fees, costs, and expenses arising from HRA's manufacturing, having manufactured and sourcing of the products manufactured by HRA under this Agreement, whenever and however asserted and established.

HRS shall indemnify and hold harmless HRA and its affiliated entities and their respective officers, employees, and agents, from any and all claims, suits, damages, attorney's fees, costs, and expenses arising from actions challenging HRS's ownership of the Intellectual Property Assets and HRA's rights thereunder pursuant to this Agreement.

**Section 6.19.     Improvements.** During the term of this Agreement, each party shall promptly inform the other party of any information that it obtains or develops regarding Improvements.

**Section 6.20.     Headings.** The headings used in this Agreement are for convenience of reference only and do not constitute a part of this Agreement for any other purpose and shall not have any force or effect in the construction of this Agreement.

**Section 6.21.     Attorney's Fee.** The prevailing party in any action between the parties which is based on this Agreement or any document related hereto shall have its reasonable attorney's fees and other costs incurred in such action or proceeding including any incurred for pre-suit, trial, arbitration, post-judgement and appeal, paid by the other party.

**Section 6.22.     Miscellaneous.**

    a.  This Agreement contains the entire understanding between the parties and supersedes all other agreements between the parties pertaining to the Intellectual Property Assets.

    b.  This Agreement shall not be deemed a franchise agreement for purposes of any state franchise disclosure law or the F.T.C. Rules.

       IN WITNESS WHEREOF, the parties have caused this Agreement to be executed on the date first written above by their authorized officers.

Hill-Rom Air-Shields, Inc.

By:_____
Hill-Rom Air-Shields, Inc.
an Delaware corporation

Hill-Rom Services, Inc.

By:_____
Hill-Rom Services, Inc.
a Delaware corporation

By:_____

By:_____

7